IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

JOSEPH KAMELGARD,

    Plaintiff,

           v.

THE AMERICAN COLLEGE OF
SURGEONS, JOHN DOES "A", "B",
AND "C" AS AGENTS OF THE ACS,
and JERZY MACURA,

    Defendants.

No.

```
FILED: JUNE 3, 2008
08CV3211          LI
JUDGE    CONLON
MAGISTRATE   JUDGE DENLOW
```

## COMPLAINT AND JURY DEMAND

Plaintiff, Joseph Kamelgard, through his attorneys, Miles Zaremski and Myron Mackoff, as his complaint against the defendants states as follows:

## ALLEGATIONS COMMON TO ALL COUNTS

### I.     JURISDICTION AND VENUE

1. This matter is brought pursuant to 28 U.S.C.A. 1332(a)(1) between citizens of different states, as thus there exists diversity jurisdiction among the parties and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

2. Venue is proper in this District pursuant to 28 U.S.C.A. 1391(b) because Defendant, American College of Surgeons, resides in this District and because circumstances for this action arose in this District.

## II.     PARTIES

3.     Plaintiff, Joseph Kamelgard ("Kamelgard") is a medical doctor and surgeon who is a citizen of the State of New Jersey.

4.     The American College of Surgeons ("ACS") is a not-for-profit corporation incorporated under the laws of the State of Illinois, whose principle place of business is in Chicago, Illinois, and is therefore a citizen of the State of Illinois pursuant to 28 U.S.C.A. 1332 (C)(1).

5.     The ACS has an entity called the Central Judiciary Committee ("CJC").   The CJC, according to the ACS website, "is a Regental Committee which has general supervision and direction of disciplinary matters under the Board of Regents.  Members of the CJC are appointed by the Board of Regents…." The members of the CJC at all relevant times to this complaint were: Arnold Brent Eastman of San Diego, California, Martin Bruce Camins of New York, New York, Carlos A. Pellegrini of Seattle, Washington, John Thomas Preskitt of Dallas, Texas, and Thomas V. Whalen of Allentown, Pennsylvania (collectively, the "CJC members").

6.     On information and belief, the CJC members meet in this district, in Chicago, Illinois at the offices of the ACS to conduct and transact the official business of their committee, including activity that pertained to a complaint filed in 2006 against Kamelgard.

7.     The identity of John Does "A", "B' and "C" are unknown to Kamelgard to date, but that at all relevant times, and on information and belief, they were physicians and surgeons and members of the ACS who reside and are engaged in their profession in

one or more states, but who submitted their opinions and findings to the ACS' CJC in this district, in Chicago, Illinois as a result of being asked to undertake this activity by one or more employees or agents of the ACS in this district, in Chicago, Illinois.

8.    Paul Collicott, M.D. ("Collicott") is a medical doctor, who is employed by the ACS as its Director of Member Services.

9.    Per deposition testimony Collicott gave on November 13, 2007 in the case of *Joseph Kamelgard, M.D. vs. the American College of Surgeons*, Dkt. No. 003322 (Circuit Court of Cook County, Chicago, Illinois) ("state court litigation"), due to the lack of expertise and background in bariatric surgery by the CJC members, he had, or cause to be, assigned in this district, in Chicago, Illinois, the investigation of a complaint filed against Kamelgard by an unknown individual in or about March, 2006 to a group of three bariatric surgeon-members of the ACS.  In his deposition, Collicott described them as consultants to the CJC.  ACS refuses to disclose the identities of these three individuals, and they remain unknown to Kamelgard to date, despite his attempts to obtain them through the state court litigation.   For the present, they are identified for purposes of this litigation as "John Does "A", "B", and "C", who are the ones Collicott had specifically assigned to investigate Kamelgard and make written findings to the CJC.

10.    As of this filing, the state court litigation is on appeal to the Illinois Appellate Court, First District, Dkt. No. 08-0342.

11.     Despite his requests and those of his lawyer to the ACS as early as April, 2006 but no later than at or about December 21, 2006, Kamelgard has yet to know who filed a complaint against him with the ACS.  Kamelgard presumptively believes as of

June 13, 2007, however, that it may be, on information and belief, a Jerzy Macura, M.D.,

who at the time was Director of Bariatric Surgery, Maimondes Medical Center,

Brooklyn, New York ("Macura").

12.     On information and belief, Macura is believed to be a citizen of the State of

New York, who may have written and authored a communication concerning Kamelgard

to the ACS in the State of Illinois, addressed his communication to the ACS in the State

of Illinois, sent it by US Mail or other delivery service with the intent that it be delivered

to the ACS in the State of Illinois, and intended that it be published in the State of

Illinois, at the ACS headquarters in Chicago, Illinois.  Further on information and belief,

Macura may not have been a member of the ACS when his communication was

published.

13.     Macura was a defendant in a medical malpractice lawsuit in federal court in

Brooklyn, New York in which Kamelgard was retained and testified as a medical expert

on behalf of the plaintiff within a month or so before the case was scheduled for trial.

The case was *Newman vs. Staten Island University Hospital and Macura.*  Kamelgard

was retained by the New York City law firm of Queller, Fisher, Dienst, Serrins, Washor

& Kool, LLP and he rendered a report to its attorney, a Mr. Maiorana, on November 2,

2005 as well.  This report did not come into existence until long after that lawsuit was

filed, and this case was the first in which Kamelgard had ever given a deposition or

provided testimony in court.

14.     On April 5, 2006, Kamelgard received from Collicott a letter in which

Collicott stated, "…we have received a complaint regarding your behavior as an expert

witness in the Newman v. Staten island Hospital, et al. lawsuit filed in the U.S. District

Court, Eastern District of New York, docket number 98 CV 4121. Specifically, the complaint alleges you were not actively involved in the clinical practice of the specialty matter of the case during the time the testimony was provided. If the allegation is true that would constitute a violation of Statement 8: Statement on the physician acting as an expert." This letter does not identify the complainant. Correspondence and phone conversation(s) are exchanged thereafter between Kamelgard and the ACS regarding these allegations.

15.     Sometime after April 5, 2006, the complaint was assigned to the CJC members for follow-up, with, without, or at the direction of, Collicott.

16.     During a telephone conversation with Collicott occurring on June 6, 2006, Kamelgard was informed of the underlying process of how the CJC reviews and follows up on complaints lodged against ACS members. Collicott told Kamelgard that it was just routine, that he should submit his letter detailing facts from his perspective, that the matter would be reviewed in a strictly confidential manner, that the CJC would recruit the opinions of three independent bariatric surgeons over that summer, and that it should all be put to rest at the October, 2006 meeting of the CJC. Kamelgard also asked Collicott if he could be present at the meeting, but was told that he could not. His presence at a meeting would only be offered if he were formally charged with one or more violations of the ACS bylaws, and that that meeting would be a required hearing.

17.     On October 26, 2006, Kamelgard received a letter from Thomas R. Russell, MD, FACS and ACS' Executive Director ("Russell"). In this letter, the ACS formally charged Kamelgard with violations of Article VII, Sections 1(f) and (i) of the ACS bylaws. These sections provided, according to the letter, (f) Unprofessional conduct; and

(i) Participating in communications to the public which convey false, untrue, deceptive, or misleading information through statements, testimonials, photographs, graphics, or other means, or which omit material information without which the communication is deceptive.  The letter went on to say that the matter would be considered by the CJC at its February 9, 2007 meeting in Chicago.  Kamelgard was invited to have legal counsel represent him if he chose to do so.  Russell fails to identify the complainant.   The letter also referenced protections afforded by the Health Care Quality Improvement Act of 1986, 42 USC 11112(b)(3) ("HCQIA").  On information and belief, it is presumed that the ACS believes itself to be an entity under the umbrella of HCQIA.

18.     On information and belief, some time prior to October 26, 2006, again, the CJC through Collicott assigned the investigation and preparation of findings related to the complaint filed against Kamelgard to the three specific physician/surgeon-members of the ACS either having background in bariatric surgery or who have specialized in the field of bariatric surgery, but all of whom purportedly met the criteria Kamelgard was accused of failing to meet.

19.     In the trial against Macura in New York federal court, Macura never challenged the testimony of Kamelgard as not being in compliance with the standards for expert testimony set forth under the U.S. Supreme Court case of *Daubert v. Merrell Dow*, nor under the Federal Rules of Evidence adopting and incorporating the *Daubert* standard.  Macura also never moved to have stricken Kamelgard's deposition or trial testimony against him.

20.     On November 27, 2006, Collicott wrote Kamelgard in reply to Kamelgard's request for confirmation of ACS' disciplinary process.  In this letter, Collicott stated that

the evidence against Kamlelgard only consisted of Kamelgard's November 30, 2005 trial testimony, his November 16, 2005 deposition testimony, and his letter to Mr. Maiorana dated November 2, 2005. Again, Collicott failed to identify the identity of the complainant.

21.    Sometime after October 26, 2006 but before December 12, 2006, Kamelgard retained legal counsel, Miles J. Zaremski ("Zaremski"), now of the Zaremski Law Group. Zaremski wrote a letter of introduction to Russell on December 12, 2006.  Zaremski asked for a brief delay to respond to the charges, which Kamelgard was given as December 20, 2006.

22.    On December 15, 2006, Zaremski spoke with an Ellen Waller ("Waller"), the Administrator for ACS' CJC.  An extension was given to January 8, 2007 to respond to the charges asserted by the ACS against Kamelgard.  However, on December 21,2006, Zaremski wrote Waller a six page letter with attachments.  The letter referenced a phone call with Waller wherein she was asked for a copy of the complaint against Kamelgard; she refused, asserting that it was ACS policy to provide only a summary of the charges. She would also not identify the person who filed the charges against Kamelgard.  One of the attachments to this complaint was a reproduction of court filings which showed that Macura had been made a party defendant in 33 other cases which appeared to be medical malpractice cases in New York courts.

23.    On December 29, 2007, Waller wrote Zaremski to say she had received Zaremski's December 21, 2006 letter, that Collicott would present Zaremski's December 21, 2006 letter to the CJC at its February 9, 2007 meeting, the hearing on the charges against Kamelgard would not proceed on February 9, 2007, and that "we will notify you

as to whether it will be deferred until the June 8, 2007 CJC meeting following the

meeting in February."

24.    On January 5, 2007, Zaremski wrote Waller again, this time with a three-page

letter, with six Exhibits attached.

25.    In Zaremski's letter to Russell of December 12, 2006, Zaremski offered to

confer with "the ACS" to try and reach an amicable resolution "short of any hearing or

further administrative action."  No written response was ever sent in reply by Russell or

anyone else representing the ACS.  However, Waller told Zaremski during one of their

communications with one another that once formal charges of bylaws violations are made

against a Fellow member of the ACS, there is no mechanism to "shortcut" the process of

having a formal hearing proceed.

26.    In fact, no hearing ever took place, so Kamelgard was left without any

opportunity to defend himself against allegations that only Collicott generally

summarized in earlier correspondence to Kamelgard.  Such hearings are critically

important, for if there is an adverse outcome for the respondent physician, such a

physician is not only subject to sanctions by the organization, but also such sanctions, on

information and belief, may be reported to the federal National Practitioner's Data Bank

under the HCQIA law, as well as the New Jersey State Board of Medical Examiners

which licenses Kamelgard.

27.    On March 2, 2007, Kamelgard received a letter from Eastman, which stated,

in part, "After due process and discussion the (CJC) Committee voted to take no further

action with regard to this matter."  This letter never neither stated to which matter is

referred nor that the formal charges against Kamelgard were being dropped, nor that

Kamelgard's conduct as charged did not violate ACS rules or bylaws, nor that there was

no finding of any wrongdoing on the part of Kamelgard.  Up until, and after, this time,

Kamelgard was never provided with the identity of his accuser, a copy of the complaint

filed against him or the identity of the three bariatric surgeons (or their findings) who

were assigned to investigate him and then make their findings known to the CJC.

Moreover, the proceedings of the CJC were to be kept confidential per ACS' policies and

procedures, and per what Collicott told Kamelgard on June 6, 2006.  Further, no other

materials of substance had been presented to the CJC on Kamelgard's behalf, other than

the letters Zaremski wrote on December 21, 2006 and January 5, 2007, from the time it

charged Kamelgard until this March 2, 2007 letter.

28.    During the Collicott deposition on November 13, 2007 in the state court

litigation, ACS' lawyer, Marc Steven Silver ("Silver"), admitted (at p. 121, ll. 5-6 of the

deposition transcript) that the ACS through Collicott has never revealed to Kamelgard

who submitted the complaint against him.

29.    Kamelgard attended meetings of the American Society for Bariatric Surgery

("ASBS")[1], in San Diego, California in June, 2007.  During these meetings, at the

opening welcome reception on Wednesday evening, June 13, 2007, Kenneth Jones, M.D.

("Jones"), who was unrelated to the ACS' CJC, Collicott or the three consulting bariatric

surgeons, asked to speak with Kamelgard in private at which time he stated to Kamelgard

that he had heard and was told that the ACS had dropped its investigation and

---

[1]    The ASBS is now known as the American Society for Metabolic and Bariatric Surgery ("ASMBS"),
although for purposes of this complaint, it will be referred to as the ASBS.

proceedings against him, and inquired if that was true. The ACS had previously communicated to Kamelgard that, consistent with ACS' policies and procedures, the charges and investigation against him were to be handled confidentially.

30.    On information and belief, this inquiry stemmed from public disclosure of the investigation and charging by one or more of the members of the CJC, John Does A, B and/or C, Collicott and/or others within the ACS who would be privy to such information.

31.    On June 13, 2007, Jones also advised Kamelgard that Macura had filed a complaint against Kamelgard, but with the ASBS, a year or so before, and the ASBS's Ethics and Advisory Committee had initiated an investigation of its own in June, 2006. Kamelgard was completely unaware of this ASBS investigation and the letter until this private conversation with Jones on June 13, 2007.

32.    On July 11, 2007, Kamelgard received a cover page communication via facsimile from Jones at Kamelgard's address in Paramus, New Jersey. Jones is, or has been, Chair of the Professional Conduct Subcommittee of the Ethics and Advisory Committee of the ASBS. Attached to this cover page was a letter Jones sent to Kamelgard dated June 21, 2006, enclosing a copy of a letter of 1 March, 2006 that Macura had sent to the ASBS in Gainsville, Florida. Macura complained about Kamelgard's testimony in the medical malpractice lawsuit against Macura and the Staten Island University Hospital. Jones' letter of June 21, 2006 was addressed to Kamelgard at "P.O. Box 1709, Newark, NJ 07101-1709", and was evidently sent by Jones from Shreveport, La., and not from the ASBS offices in Florida.

33.    Kamelgard never received Jones' letter with the Macura letter, as mailed on or about June 21, 2006, because Kamelgard does not, and has never, lived in Newark,

10

New Jersey, nor has he ever had a mailing address to which the Jones' letter was addressed and sent at the time.  Again, the first time that Kamelgard ever saw the Jones' letter of June 21, 2006 with the Macura letter enclosure was when Jones sent it all to Kamlegard via facsimile on July 11, 2007.

34.    Moreover, the first time that Kamelgard reasonably became aware that perhaps it was Macura who filed a complaint against him with the ACS was on July 11, 2007, when Kamelgard received the Jones' letter with the Macura letter of March 1, 2006 attached and addressed to the ASBS.

35.    On information and belief, presuming it was Macura who filed a writing with the ACS regarding Kamelgard arising from his (Kamelgard's) participation as an expert witness for the plaintiff in the *Newman v. Staten Island University Hospital* case, Macura's writing was intended to be received at ACS headquarters in this district in Chicago, Illinois, was addressed to the ACS in this district in Chicago, Illinois, and was published in this district in Chicago, Illinois.

## COUNT I
## DEFAMATION *PER SE* (MACURA)

36.    On information and belief, and better known to defendants, based on information discovered by Plaintiff on June 13, 2007 from his discussion with Jones, Defendant Macura submitted a letter to the ACS imputing that Plaintiff was unable to perform his duties as a physician, lacked integrity as a physician, or lacked ability as a physician.

37.    On information and belief, the statements contained in the Macura letter to the ACS identified in paragraph 36, above, were false and Macura knew they were false or made with a reckless disregard for whether they were false or not.

11

38.    On information and belief, the statements contained in the Macura letter to the ACS identified in paragraph 36, above, were made with actual malice and written and communicated with the sole intent to willfully and wantonly harm Kamelgard in his person, reputation and profession, so that his reputation was lowered in the eyes of the community or to deter third persons, such as physicians, from associating with him.

39.    The Macura letter of March 1, 2006 to the ASBS, (attached hereto and incorporated by reference herein as Exhibit A) which Plaintiff first discovered on June 13, 2007, contained false statements, which Macura knew were false or that he made with a reckless disregard for whether they were false or not.

40.    The Macura letter of March 1, 2006, was intentionally and maliciously written and not otherwise privileged or subject to a qualified privilege or made in good faith, not based on fact or subject to an innocent construction.

41.    The Macura letter of March 1, 2006 was made with actual malice and written and communicated with the sole intent to willfully and wantonly harm Kamelgard in his person, reputation and profession, so that his reputation was lowered in the eyes of the community or to deter third persons, such as physicians, from associating with him.

WHEREFORE, for all of the foregoing reasons, Plaintiff Joseph Kamelgard prays that judgment be entered against Defendant Macura on this Count I, that compensatory damages be assessed in a sum to be determined at trial in excess of $75,000 plus costs, expenses and fees, and that the Court assess punitive damages against Defendant Macura and for other and further relief that this court deems just.

## COUNT II
## DEFAMATION *PER SE* (ACS AND ITS AGENTS)

42.    On information and belief, those facts better known to Defendants, the ACS, through its agents, the CJC members, John Does "A", "B' and "C", and/or Collicott, wrongfully accused, investigated and, on information and belief, made findings not capable of an innocent construction that Kamelgard violated its rules and conduct thereby imputing that Plaintiff was unable to perform his duties as a physician, lacked integrity as a physician, or lacked ability as a physician.

43.    On information and belief, those facts better known to Defendants, the ACS, through its agents, the CJC members, John Does "A", "B' and "C", and/or Collicott, published these false accusations concerning Kamelgard in his person, reputation and profession so that his reputation was lowered in the eyes of the community or deterred third persons, such as physicians, from associating with him, and caused him damage.

WHEREFORE, for all of the foregoing reasons, Plaintiff Joseph Kamelgard prays that judgment be entered against Defendants ACS, and John Does "A", "B" and "C" on this Count II, that compensatory damages be assessed in a sum to be determined at trial in excess of $75,000 plus costs, expenses and fees, and for other and further relief that this court deems just.

## COUNT III
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (MACURA)

44.    By sending defamatory letters to ACS and the ASBS, Macura's conduct was extreme and outrageous.

45.    By sending the defamatory letters to the ACS and the ASBS, Macura intended to cause Plaintiff emotional distress or knew there was a high probability that his actions would cause Plaintiff severe emotional distress.

46.    By sending the defamatory letters to the ACS and the ASBS, Macura has willfully and wantonly caused Plaintiff severe emotional distress that has required Plaintiff to seek medical and psychiatric care.

WHEREFORE, for all of the foregoing reasons, Plaintiff Joseph Kamelgard prays that judgment be entered against Defendant Macura on this Count III, that compensatory damages be assessed in a sum to be determined at trial in excess of $75,000 plus costs expenses and fees, and that the Court assess punitive damages against Defendant Macura and for other and further relief that this court deems just.

## COUNT IV
## INVASION OF PRIVACY
## (ACS AND ITS AGENTS)

47.    On information and belief, the ACS and/or its agents, publicized information about the investigation into the allegations against Plaintiff in a way that Jones and other members of the ASBS were able to learn of them despite the fact that such proceedings were confidential.

48.    The investigation of the allegations against Plaintiff and the ACS's charging him with violations of its rules were private and not public facts.

49.    The matters made public by the ACS and/or its agents were offensive to a reasonable person.

50.    The matters made public by the ACS and/or its agents about the investigation into the allegations against Plaintiff were not of legitimate public concern.

WHEREFORE, for all of the foregoing reasons, Plaintiff Joseph Kamelgard prays that judgment be entered against Defendants ACS and John Does "A", "B" and "C" on

this Count IV, that compensatory damages be assessed in a sum to be determined at trial in excess of $75,000 plus costs expenses and fees, and for other and further relief that this court deems just.

## COUNT V
## FALSE LIGHT INVASION OF PRIVACY
## (MACURA)

51.    Macura's statements to the ACS and ASBS placed Plaintiff in a false light.

52.    The false light in which Plaintiff was placed would be offensive to a reasonable person.

53.    When Macura made the statements that placed Plaintiff in a false light, he knew they were false or made them with a reckless disregard for whether they were true or not.

WHEREFORE, for all of the foregoing reasons, Plaintiff Joseph Kamelgard prays that judgment be entered against Defendant Macura on this Count V, that compensatory damages be assessed in a sum to be determined at trial in excess of $75,000 plus costs expenses and fees, and that the Court assess punitive damages against Defendant Macura and for other and further relief that this court deems just.

### JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully submitted,

__/s/ Myron Mackoff____
Attorney for plaintiff

15

Myron Mackoff
407 S. Dearborn St., Suite 1310
Chicago, IL 60605
Tel. (312) 922-5236
Atty. Bar No 6225518

Myles Zaremski
Zaremski Law Group
707 Skokie Blvd.
Suite 600
Northbrook, Illinois 60062

JUDGE    CONLON

MAGISTRATE    JUDGE DENLOW



Maimonides Medical Center
948 49th Street  Second Floor
Brooklyn, New York 11219
718-283-7602
718-635-7228 Fax

Jerzy Macura, MD and Richard Lazzaro, MD

Department of Surgery

**MAR 2 0 2006**

# Maimonides

1 March 2006

**American Society for Bariatric Surgery**
7328 West University Avenue, Suite F
Gainesville, FL 32607

Re:  Dr. Joseph Kamelgard

To the President and Membership Committee of The American Society for Bariatric Surgery:

I wish to bring to your attention the deplorable conduct of a fellow member of the society. I am obligated to discuss the disturbing fact that there are some members of our society that have no reservations in testifying against their own colleagues as long as the price is right. In this case, Dr. Joseph Kamelgard of New Jersey went even further to help a plaintiff's case, not hesitating to misrepresent the medical literature, create his own standard of care and represent himself as an expert in the field of bariatric surgery despite having almost no current surgical experience.

Recently, I went to trial in a medical malpractice lawsuit brought against me and Staten Island University Hospital which dates back to 1997. The case involved a morbidly obese 51-year-old male who underwent an open Roux-en-Y gastric bypass. The post-operative course was uneventful for the initial 36 hours, but the patient then spiked a fever to 102.6, followed by severe, foul-smelling diarrhea which continued throughout the rest of post-operative day 2. The films from the upper GI gastrograffin swallow clearly demonstrated an intact anastomosis, with a small amount of air present in the excluded stomach. Apart from the diarrhea and fever, the patient was otherwise asymptomatic; he was without pain, had good I/O levels and otherwise normal vital signs. The patient was monitored closely on the floor until he developed a drop in urine output and blood pressure. At this time, his respiration became labored prompting first a transfer to ICU, intubation and fluid challenges to address the hypotension and decreased urine output.

At the time of this surgery I had performed at least 300 gastric bypasses as lead surgeon and I have to admit that I was at a loss as to the cause of this patient's deterioration. By 12:00 noon on post-operative day 3, I decided to take him back to the operating room for exploration. In the OR, I found a massively distended stomach and swollen loops of small bowel without mechanical obstruction. I drained the stomach with a large gastrostomy tube, then closed the incision with a large mesh suspecting abdominal compartment syndrome. Eventually the patient did well, and he was discharged three weeks later. Three days after discharge, he severed his relationship with me and had a lawyer come to his home to take pictures of his surgical hernia and open incision.

The lawyers for the patient twice hired as expert witnesses surgeons with no bariatric surgery experience. The first expert contended that my gastric pouch was too small (it was approximately 15-20 ml in size), while the second criticized that my biliopancreatic limb was too short (the small intestine was divided 25 centimeters beyond the Ligament of Treitz). Finally, one month before trial, they succeeded in hiring Dr. Joseph Kamelgard of New Jersey.

Dr Kamelgard is a member of American Society for Bariatric Surgery and even sits on one committee (as do I). I was born and raised in Poland and attended medical school in my native country before emigrating to America; Dr. Kamelgard was born here in the United States but could not get into an American medical school. Dr. Kamelgard admitted to failing his ECFMG qualifying exam at least twice (he testified that he was not certain how many times he sat for the exam), and likewise failed his surgical boards the first time. With regard to his bariatric surgery experience, Dr. Kamelgard did not complete his formal surgical training until 1998, more than one year after the case at issue in this lawsuit. He did not become involved in bariatric surgery until the summer of 1999. In his entire career, he believes he has performed 250 bariatric cases as the lead surgeon.

After completing a laparoscopic fellowship in Texas in 1998 Dr.Kamelgard started his bariatric surgical career at University Hospital Newark, where Dr.Benjamin Rush performed a large number of gastric bypasses. Still searching for a better mentor, plaintiff's expert joined a practice with Dr Rafael Capella, where he mastered VBG Roux-Y gastric bypass before deciding to start his own solo practice.

I feel compelled to write this letter because Dr. Kamelgard testified in court that even though his professional career as a bariatric surgeon begun more than a year after I performed the Roux-Y procedure at issue in this lawsuit in April 1997, he declared he was competent to testify as an expert because he trained and was educated with medical literature and texts published before 1997. As an expert, Dr Kamelgard accused me of ordering the wrong test, stating that the standard of care in 1997 required the performance of a CT scan with contrast of the abdomen, rather than an upper GI series. In his opinion, a CT scan of the abdomen would definitely show gastric distention, where an upper GI series would not. Dr. Kamelgard testified to this under oath yet he never bothered to review this patient's UGI films, films which clearly showed a non-distended excluded stomach. Not only did Dr. Kamelgard fail to consider these films before formulating his opinion against me in advance of trial, he and the plaintiff's lawyer decided to ignore this study at trial despite these films being present in the courtroom on the day Dr. Kamelgard testified.

Dr Kamelgard further claimed that the distended stomach should have been drained percutaneously by an Interventional Radiologist, going so far as to state that percutaneous gastrostomy was the standard of care in 1997. When Dr. Kamelgard was confronted by my attorney with Dr. Robert Brolin's peer-review article discussing the author's experience with percutaneous drainage in morbidly obese patients who had undergone gastric bypass, published in 2004 in the American Journal of Roentgenology (a study Dr. Brolin and his colleagues claimed to be the first published review of such an approach), Dr. Kamelgard claimed that since this was a radiology journal, it must be a different Robert Brolin.

I am happy to advise that I won my case, thanks at least part ally to Dr. Kamelgard. What hurts me here, is that there are members [of the ASBS and diplomats of the American College of Surgeons] who have no reservations testifying against their own colleagues as long as the price is right. Since leaving his faculty position at University Hospital Newark/New Jersey Medical School as of September 2003 until he testified in Court against me on November 30, 2005 Dr. Kamelgard performed in his own words, "a handful of surgeries, maybe 3 or 4."

2/3
Jerzy Macura, MD

FROM :                          FAX NO.  :                    Jul. 11 2007 12:09PM  P5

In one month, Dr Kamelgard earned more than $25,000, including $12,500 to testify against me at trial. He chose to earn his salary by misrepresenting the medical literature and creating his own standard of care.

I am including Dr Kamelgard's initial written report, the examination before trial and his testimony at trial on direct and cross-examination. As a member in good standing, I request that this testimony and expert opinion be closely reviewed, as I do not feel that after such conduct, this gentleman deserves to remain a member in good standing of this organization. I thank you in advance for your consideration on this most serious matter. Should you require any further information, do not hesitate to contact me directly.

Sincerely,

Jerzy Macura,M .D.

Director of Bariatric Surgery
Maimonides Medical Center
Brooklyn, New York