**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSEPH KAMELGARD | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 08 CV 3211 |
| v. | ) | |
| | ) | Judge Conlon |
| THE AMERICAN COLLEGE OF SURGEONS, | ) | |
| JOHN DOES "A", "B", AND "C" AS AGENTS | ) | Magistrate Judge Denlow |
| OF THE ACS, and JERZY MACURA, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

**INTRODUCTION**

Plaintiff Joseph Kamelgard brings a multi-count federal complaint against multiple defendants over a medical peer review action in which all charges against him were dropped without his ever even having to appear. Rather than leave the matter at that, Plaintiff seeks not only to impinge on defendants' Constitutional right to freedom of speech but also to eviscerate state and federal protection for medical peer review proceedings. Plaintiff does this even though he is unable to identify the allegedly defamatory statements that underlie his claim for defamation against the American College of Surgeons (the "College"). Regardless, the defamation claim is time-barred. Although Plaintiff's vagueness may be tactically advantageous (it helps obscure the obvious defects in his claim), the Complaint fails to meet basic federal court pleading standards. In addition, Plaintiff attempts to sue based on speech (evaluations and charges in a quasi-judicial medical peer review) that is privileged, confidential and inadmissible under common law and federal and state statutes.

Plaintiff's private facts claim against the College is even more outrageous. Plaintiff claims the College disclosed private facts about him even though he sues upon allegedly private facts that he himself publicized. The College therefore respectfully requests that this Court dismiss Counts II and IV (the only counts against the College) of the Complaint with prejudice.

**BACKGROUND**

Plaintiff is a doctor living in New Jersey. (Compl. ¶ 3.) (A copy of the Complaint is attached as Exhibit A.) Plaintiff testified as an expert witness in *Newman v. Staten Island University Hospital and Macura*, the medical malpractice trial of Jerzy Macura in the United States District Court for the Eastern District of New York. (Compl. ¶ 13.)

The College is an Illinois not-for-profit. (Compl. ¶ 4.) The College maintains a peer review process, which is administered by its Central Judiciary Committee ("CJC") and metes out discipline on Fellows and Members. The CJC is a peer review committee, comprising five College members. (Compl. ¶ 5.) Under the bylaws, the peer review process includes written notice, an opportunity for the accused to be present and present evidence at the CJC's meeting, and an appeal process. (Bylaws, Art. VII, § 2.) (A copy of the College Bylaws is attached as Ex. B.)[1] In addition, the CJC conducts its peer reviews confidentially. (Compl. ¶ 27.) The CJC conducts peer review to ensure that the College's Members and Fellows adhere to the College's professional standards. (Bylaws, Art. VII, § 1.)

On April 5, 2006, the College informed Plaintiff that it had received a complaint regarding his behavior as an expert witness in the *Newman* case. (Compl. ¶ 14.) Because Plaintiff is a bariatric surgeon and none of the members of the CJC are bariatric surgeons, Dr. Collicott asked three bariatric surgeons who are members of the College to review the complaint. (*Id.* ¶ 9.) The College has not disclosed the identities of those individuals to Plaintiff. (*Id.* ¶ 9.) On October 26, 2006, Plaintiff received a letter from the College notifying him that he had been formally charged with violations of the Bylaws. (*Id.* ¶ 17.) More specifically, Plaintiff was charged with unprofessional conduct and participating in communications to the public that convey false information. (*Id.* ¶ 17.) In December, Plaintiff's attorney sent a lengthy letter responding to the charges. (*Id.* ¶ 22.) On March 2, 2007, Plaintiff received a letter notifying him that the College would take no further action regarding his peer review proceeding. (*Id.* ¶ 27.)

---

[1] When a document is referred to in a complaint and forms a basis of the claims, as is true of the Petition here, the document constructively becomes a part of the pleading and is cognizable on a motion to dismiss. *See Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim."); *Ogdon v. Hoyt*, 2005 WL 66039, at *3 (N.D. Ill. Jan. 11, 2005) (same). Plaintiff discusses the Bylaws in his Complaint. (Compl. ¶ 17.)

Plaintiff promptly sued the College in Illinois state court. (*See* Verified Petition for Discovery Before Suit (the "Petition"), attached as Ex. C.)[2] Plaintiff filed his Petition on March 30, 2007 and sought "the identity of those physicians delegated by Respondent and/or its CJC to investigate the complaint lodged against Petitioner, as well as any and all documentation generated by these physicians, containing their findings, recommendations, conclusions and investigation." (Ex. C, Prayer for Relief.) Plaintiff stated that he was requesting such information "in order to depose one or more of them, for the purpose of ascertaining the identities of those who may be responsible in damages to Petitioner, including his reputation, professional standing and/or his financial interests." (*Id.*) The state court claim was dismissed and is now on appeal.

Months after filing his state court litigation, Plaintiff discussed his peer review with another doctor. In June 2007, Plaintiff claims that he attended meetings of the American Society for Bariatric Surgery in California. (Compl. ¶ 29.) During a reception on June 13, 2007, Plaintiff spoke with Dr. Kenneth Jones. (*Id.* ¶ 29.) According to the Complaint, Dr. Jones "asked to speak with Kamelgard in private at which time he stated to Kamelgard that he had heard and was told that ACS had dropped its investigation and proceedings against him, and inquired if that was true." (*Id.* ¶ 29.) Plaintiff filed this lawsuit on June 3, 2008.

## STANDARD OF REVIEW

A district court may grant a motion to dismiss for failure to state a claim under Rule 12(b)(6) if it is clear that no relief can be afforded to a plaintiff based on the allegations set forth in the complaint. *See Evans v. Lederle Lab*, 167 F.3d 1106, 1107 (7th Cir. 1999). In evaluating a

---

[2] Documents from the state court proceeding are cognizable on a motion to dismiss. First, a court may take judicial notice on a 12(b)(6) of pleadings from another matter. *Trustees of the Local 734 Bakery Drivers Health & Welfare Plan, v. Wolff*, 537 F. Supp. 2d 951, 954 (N.D. Ill. 2008) (noting that "without converting the motion to one for summary judgment, judicial notice may be taken of the state court documents"). In addition, the Petition, like the Bylaws, is referenced in the Complaint. (Compl. ¶¶ 9, 28.)

motion to dismiss pursuant to Rule 12(b)(6), a court "must accept as true all the plaintiff's well-pleaded factual allegations and the inferences reasonably drawn from them." *Gibson v. Chicago*, 910 F.2d 1510, 1520-21 (7th Cir. 1990) *citing Yeksigian v. Nappi*, 900 F.2d 101, 102 (7th Cir. 1990). The court, however, need not accept inferences unsupported by factual allegations in the complaint or legal conclusions set forth by the plaintiff. *See Zimmerman v. Tribble*, 226 F.3d 568, 572 (7th Cir. 2000). Dismissal is appropriate when "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spaulding*, 467 U.S. 69, 73 (1984).

Peer reviews involve First Amendment-protected speech. In defamation cases, resolution of non-meritorious cases through motion practice furthers First Amendment interests because doing so protects defendants from the chilling effect of such litigation. *See Klayman v. Segal*, 783 A.2d 607, 613 n.5 (D.C. Ct. App. 2001) (noting that "in the First Amendment area, summary procedures are essential"); *see also Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966) ("In the First Amendment area, summary procedures are even more essential. For the stake here, if harassment succeeds, is free debate."); *Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 30 (D.D.C. 1995) ("Given the threat to the first amendment posed by nonmeritorious defamation actions, it is particularly appropriate for courts to scrutinize such actions at an early stage of the proceedings to determine whether dismissal is warranted").

## ARGUMENT

### I.   Plaintiff's Defamation Claim Has No Basis in Fact or Law Because Plaintiff Has Not and Cannot Set Forth the Allegedly Defamatory Statements.

Plaintiff purports to bring a claim for defamation *per se* without identifying the statements upon which he sues. According to Plaintiff:

4

> On information and belief . . . the ACS, through its agents, the CJC members, John Does "A", "B" and "C", and/or Collicott, wrongfully accused, investigated and, on information and belief, made findings not capable of an innocent construction that Kamelgard violated its rules and conduct . . . . and published those false accusations concerning Kamelgard in his person, reputation and profession so that his reputation was lowered in the eyes of the community or deterred third persons, such as physicians, from associating with him, and caused him damage.

(Compl. ¶¶ 42, 43.) This is the sum total of Plaintiff's defamation claim. Plaintiff does not

identify a specific speaker, a time when the alleged statements were made, a publication in which

they were made, to whom the statements were made, or what statements were allegedly false.

What is clear is that Plaintiff does not base his claims on any statements allegedly made to Dr.

Jones because what Dr. Jones allegedly said—that the College had dropped its investigation and

proceedings against Dr. Kamelgard—was true. (Compl. ¶ 29.)

Courts in the Northern District of Illinois do not require a letter-perfect rendition of the

allegedly defamatory statements, but they do impose a higher standard of pleading on defamation

plaintiffs. "Although it is true that some specificity for defamation claims is required, the

specificity requirement pertains to the content of the defamatory remarks." *Fidelity Nat'l Title

Ins. Co. of New York v. Intercounty Nat'l Title Ins. Co.*, 161 F. Supp. 2d 876, 882 (N.D. Ill.

2001). The purpose of this requirement is to provide defamation defendants "with general

knowledge of the exact language alleged, to allow them to form a responsive pleading." *Wynne

v. Stevenson*, 2002 WL 31804497, at *2 (N.D. Ill. Dec. 13, 2002). Here, Plaintiff does not

provide sufficient specificity regarding the content of the defamatory remarks to allow the

College to respond. The College has no idea what the allegedly false statement at issue is. For

example, the College could not argue that the statements at issue are reasonably subject to an

innocent construction, because it has no idea what statements are at issue. The College could not

5

argue that the statements are protected opinion for the same reason. Moreover, the College suspects that Plaintiff has no idea what he believes the allegedly false statement is either. Such nebulous pleading cannot survive.

## II.    Plaintiff's Defamation Claim is Time-Barred.

Illinois has a one-year statute of limitation for defamation actions. 735 ILCS 5/13-201.[3] As noted above, the only statement outside the peer review process Plaintiff identifies (which, by the way, was not even made by the College) is Dr. Jones' comment regarding the peer review process. That statement was true—Plaintiff does not even bother to include it in his defamation claim—so the statements about which Plaintiff complains must have occurred during the peer review process. That process was finished, at the latest, on March 2, 2007 when Dr. Kamelgard received a letter stating that the College would "take no further action with regard to this matter." (Compl. ¶ 27.) Plaintiff therefore filed this action well after the statute of limitations expired.

## III.    Plaintiff Improperly Bases his Defamation Claim on Privileged, Confidential and Inadmissible Statements.

Although it is not clear what statements Plaintiff sues on, it is clear that the statements must have been made in the context of a quasi-judicial medical peer review proceeding.[4] (Compl. ¶¶ 42, 43.) Plaintiff makes clear that his allegations arise out of the accusations, investigation, and findings that occurred in the peer review process. (*Id.*) This is fatal to Plaintiff's claim,

---

[3] According to the College Bylaws: "Any action brought in law or in equity against the College, including any action relating to membership, shall be brought in the courts, federal or state, and shall be governed by the laws of the state in which the principal office of the College is situated." (Bylaws, Art. VIII, § 5.) The College's principal office is located in Chicago, Illinois. (Compl. ¶ 4.)

[4] Plaintiff claims that the College "published" the accusations, but, again, the only statement Plaintiff alleges outside the peer review is Dr. Jones's statement at the cocktail party. That statement was true, and Plaintiff made the same statements in his state court petition. Therefore, according to Plaintiff's allegations, the allegedly defamatory statements must have been "published" in the peer review proceeding itself.

6

because statements in such proceedings are protected by common-law privileges. In addition, the United States and Illinois legislatures have built strong bulwarks to protect physicians and organizations engaged in medical peer reviews from disclosure of the physicians' identities and findings and from liability for their activities. As the legislatures have recognized, there is a strong public interest in shielding doctors and organizations who serve their profession and the public by engaging in and sponsoring the peer review process.

A.    **The Statements at Issue Are Absolutely Privileged Under Illinois Common Law.**

Illinois courts accord an absolute privilege to statements made during quasi-judicial proceedings. *Illinois College of Optometry v. Labombarda*, 910 F. Supp. 431, 432 (N.D. Ill. 1996). In order to determine whether the absolute privilege applies, Illinois courts look at six factors (not all of which must necessarily be present) to differentiate a quasi-judicial body from one merely performing an administrative function: 1) power to exercise judgment and discretion; 2) power to hear and determine or ascertain facts and decide; 3) power to make binding orders and judgments; 4) power to affect the personal or property rights of private persons; 5) power to examine witnesses, compel the attendance of witnesses, and hold a hearing; and 6) power to enforce decisions or impose penalties. *Id.* The College exercises all of those powers to varying degrees. Four of the factors (Nos. 1, 3, 4, and 6) relate to the power to make and enforce judgments. Under its Bylaws, the College has the ability to expel, call for the resignation of, or otherwise discipline any Fellow or member" and to require that a fellow return his or her certificate of Fellowship or other indicia of Fellowship. (Bylaws, Art. VII.) Two of the factors Nos. 2 and 5) relate to the conduct of hearings. The College provides notice of hearings and allows the "Fellow or member an opportunity to appear in person with counsel if so desired and

7

to submit such evidence as the Fellow or member deems proper to show that disciplinary action should not be taken." (Bylaws, Art. VII, § 2.) Arguably, the only power the College does not have is the power to compel the attendance of witnesses, but "[a] quasi-judicial body also need not possess all six powers." *Illinois College of Optometry*, 910 F. Supp. at 432. The College's CJC proceeding is a quasi-judicial proceeding, and, as noted above, Plaintiff appears to sue on statements made in the course of that proceeding (he could not possibly be suing on anything relating to Dr. Jones's true statements). Those statements, however, are absolutely privileged.

**B.**     **Even if the Statements at Issue were not Deemed Absolutely Privileged, They are Subject to a Qualified Privilege, and Plaintiff Has Not Overcome the Privilege.**

Even if an absolute quasi-judicial privilege does not apply to the College's peer review process, a qualified privilege does. *See Kuwik v. Starmark Star Marketing and Administration, Inc.*, 156 Ill. 2d 16, 619 N.E.2d 129 (1993) (finding that defendant health insurer's letters to insured reflecting that services rendered by plaintiff chiropractor were outside scope of her license were qualifiedly privileged). Under the analysis adopted in *Kuwik*, the Illinois Supreme Court recognized conditionally privileged occasions in three classes:

> situations in which some interest of the person who publishes the defamatory matter is involved (2) situations in which some interest of the person to whom the matter is published or of some other third person is involved (3) situations in which a recognized interest of the public is concerned.

*Id* 619 N.E.2d at 135 (citations omitted).

It is the court's duty, as a matter of law, to determine whether a qualified privilege applies. *Id* Once the court determines that a qualified privilege is applicable, plaintiff must show: "'a direct intention to injure another, or . . . a reckless disregard of [the defamed party's] rights and of the consequences that may result to him.'" *Id* 619 N.E.2d at136 (citing *Bratt v.*

8

*International Business Machines Corp.*, 467 N.E.2d 126, 131 (1984), quoting *In re Retailers Commercial Agency, Inc.*, 174 N.E.2d 376, 380 (1961)).

Here, a qualified privilege exists because the College's peer review process is designed to protect the interests of the public in receiving quality medical care and ensuring that surgical physicians do not exceed the scope of their expertise in rendering services or offering opinions as experts in medical malpractice cases. Accordingly, Plaintiff must plead and prove that the College intended to injure him or acted with reckless disregard of his rights and the resulting consequences. Plaintiff has not and cannot (in good faith) make such allegations.

### C.    Illinois Law Absolutely Immunizes the Statements at Issue Here.

The Illinois Medical Studies Act ("MSA"), 735 ILCS 5/8-2101 – 2105, provides extraordinary protection to doctors and organizations involved in peer review activities. As the Illinois Supreme Court has stated:

> [T]he law's purpose is to ensure that members of the medical profession will effectively engage in self-evaluation of their peers in the interest of advancing the quality of health care. The statute is premised on the belief that, absent the statutory peer-review privilege, physicians would be reluctant to sit on peer-review committees and engage in frank evaluations of their colleagues.

*Roach v. Springfield Clinic*, 157 Ill.2d 29, 39, 623 N.E.2d 246, 251 (1993). Under the MSA, certain information is deemed privileged, confidential and not admissible in evidence. Practically speaking, no cause of action can be brought if based upon information subject to the MSA.

Information receives protection under the MSA if it is: 1) "information, interviews, reports, statements, memoranda, recommendations, letters of reference or other third party confidential assessments of a health care practitioner's professional competence . . . ."; 2) used by, among other entities, "allied medical societies," and 3) "used in the course of internal quality

control or of medical study for the purpose of reducing morbidity or mortality, or for improving

patient care. . . ." 735 ILCS 5/8-2101. If so, the records "shall be privileged, [and] strictly

confidential." *Id.* Furthermore, protected information "shall not be admissible as evidence, nor

discoverable in any action of any kind in any court or before any tribunal, board, agency or

person." 735 ILCS 5/8-2102.

The information at issue here—peer review materials—meets the standards for MSA

protection. First, the College is an "allied medical society." In *Niven v. Siqueria*, the Illinois

Supreme Court identified the College as one of "several established medical societies" in the

context of the MSA. 109 Ill. 2d 357, 363, 366-67, 487 N.E.2d 937, 941-42 (1985).

In addition, the peer review process is the sort of confidential assessment of a health care

professional's competence that qualifies for protection. The peer review of expert testimony is

used for the purpose of improving patient care. Reviewing expert testimony allows the College

to identify and sanction physicians who provide misleading information to the public regarding

medical care. The Seventh Circuit recognized the link between patient care and expert testimony

in a case involving peer review of expert testimony: "[T]here is a strong national interest, which

we doubt not that Illinois would embrace, in identifying and sanctioning poor-quality physicians

and thereby improving the quality of health care." *Austin v. American Assoc. of Neurological

Surgeons*, 253 F.3d 967, 974 (7th Cir. 2001). The court further noted that, "[a]lthough Dr. Austin

did not treat the malpractice plaintiff for whom he testified, his testimony at her trial was a type

of medical service and if the quality of his testimony reflected the quality of his medical

judgment, he is probably a poor physician." *Id.* The College's quality control function extends to

the review of expert witness testimony.

10

In *Green v. Silver Cross Hospital*, the court closely examined the applicability of the MSA to defamation claims and determined that statements subject to the MSA are "'privileged' in the substantive sense: They cannot be the subject of a defamation claim." 606 F. Supp. 87, 90 (N.D. Ill. 1984). A Northern District court went even further in *La Marca v. Lakefield Municipal Hospital* and confirmed not only that the MSA privilege defeats a defamation action but also that it is absolute. 1985 WL 1874, at *4 (N.D. Ill. June 25, 1985). The court noted that the Illinois legislature intended "that peer review committees at hospitals and doctors who supply medical information to them communicate freely without threat of defamation suits by doctors who are refused staff privileges." *Id.* at *3. Accordingly, "[w]e conclude that one of the purposes of the Act as amended was to permit doctors to speak freely about their peers without threat of defamation actions with the ensuing expense of defense and requirement of proof of good faith." *Id.* at *4. In light of this, the court emphasized that "a frank and open discussion which is fundamental to peer review cannot occur when the participants are concerned about the possibility of subsequent discovery of their remarks and lawsuits claiming malicious defamation." *Id.* The court concluded by holding that the information protected in Section 5/8-2101 is "absolutely privileged" and the MSA "creates an absolute bar to Dr. LaMarca's defamation action" because the letter at issue "cannot be introduced into evidence in this court." *Id.* Plaintiff faces the same obstacle here—everything he would seek to introduce into evidence is absolutely privileged and inadmissible—and it is fatal to his defamation claim.

### D.    Federal Law Preempts All Damages for the Peer Review at Issue Here.

The Health Care Quality Improvement Act of 1986, 42 USC §§ 11111-11152 ("HCQIA"), also provides blanket immunity for the College in this matter. As Congress noted in passing the HCQIA, "[t]here is an overriding national need to provide incentive and protection

11

for physicians engaging in effective professional peer review." 42 USC § 11101(5). Accordingly, as this Court has noted, "HCQIA preempts all civil liability for reporting conduct." *Bearden v. Humana Health Plan, Inc.*, 1992 WL 245604, at *4 n.3 (N.D. Ill. Sept. 23, 1992). Under the HCQIA, a "professional review body," or person assisting a review body, performing a "professional review action" "shall not be liable under any law of the United States or of any State (or political subdivision thereof) with respect to the action." 42 USC § 11111(a)(1). The issue is whether the College can avail itself of the blanket immunity accorded professional review bodies engaging in professional review actions.

First, the College is a "professional review body." Under HCQIA, a "professional review body" is defined as a "health care entity." 42 USC § 11151(11). The College falls under the HCQIA's definition of "health care entity." 42 USC § 11151(4) (defining "health care entity" to include "professional society (or committee thereof) of physicians or other licensed health care practitioners that follows a formal peer review process for the purpose of furthering quality health care"). The College meets all of these criteria.

The question then becomes whether the College was engaging in a "professional review action" with regard to Dr. Kamelgard. A "professional review action" must be taken: 1) in the reasonable belief that the action was in furtherance of quality health care; 2) after a reasonable effort to obtain the facts; 3) after adequate notice and hearing procedures are provided to the physician; and 4) in the reasonable belief that the action was warranted by the facts known after reasonable effort to obtain facts. 42 USC § 11112(a). In addition, there is a presumption that the professional review action has met these standards unless the presumption is rebutted by a preponderance of the evidence. 42 USC § 11112(a).

The College's actions with regard to Dr. Kamelgard fulfill these standards. First, the College had a reasonable belief that the action was undertaken in furtherance of quality health care. Plaintiff's Complaint makes clear that the College brought the peer review to enforce its Bylaws. (Compl. § 17.) Under the Bylaws, a Fellow or member may be disciplined for conduct inconsistence with the purposes of the College. (Bylaws, Art. VII, § 1.) According to the College's Statements on Principles, the College "has had a deep and effective concern for the improvement of patient care." Congress has stated that this first criterion is satisfied if "the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." H.R. Rep. 99-903, at *10, *reprinted in* 1986 U.S.C.C.A.N. at 6384, 6393. In addition, the College performed a reasonable review of the facts. The College sent the complaint against Dr. Kamelgard to three bariatric surgeons who are Fellows of the College, and it invited Dr. Kamelgard to present rebuttal evidence before it ultimately dropped the matter. (*See* Compl. ¶¶ 16-25.) The third criterion is notice, and the HCQIA provides detailed requirements for notice and a hearing. 42 USC § 11112(b). Here, the action against Dr. Kamelgard was dismissed before it even went to a hearing, so only the notice provisions are relevant. The notice requirements are basic and simply require that the physician receive notice stating: that a professional review action has been proposed, the reasons for the action, that the physician has the right to request a hearing, the time limit within which a physician may request a hearing, and a summary of the physician's rights in the hearing. 42 USC § 11112(b). Plaintiff received this information and more. (*See* Compl. ¶¶ 14, 16, 17 and 20.) Finally, Dr. Kamelgard could not take issue with the resolution because the College chose not to pursue the peer review.

13

As one federal court has noted, "Congress clearly intended HCQIA to permit defendants in suits arising out of peer review disciplinary decisions to file motions to resolve the issues concerning immunity from monetary liability as early as possible in the litigation process." *Bryan v. James E. Holmes Regional Med. Ctr.*, 33 F.3d 1318, 1332 (11th Cir. 1994). According to the House Committee, "these provisions allow defendants to file motions to resolve the issue of immunity in as expeditious a manner as possible." H.R. Rep. 99-903, at *12, *reprinted in* 1986 U.S.C.C.A.N. at 6394. Moreover, courts routinely find defamation claims barred under the HCQIA. *See Van v. Anderson*, 2003 WL 21017016, at *1 (5th Cir. Apr. 14, 2003); *McLeay v. Bergan Mercy Health Sys. Corp.*, 714 N.W.2d 7, 17 (Neb. 2006); *Munch v. Charlotte Hungerford Hosp.*, 2002 WL 983349, at *4 (Conn. Super. Ct. Apr. 22, 2002); *Gelbard v. Bodarry*, 270 A.D. 2d 866, 866 (N.Y. Sup. Ct. App. Div. Mar. 29, 2000). Plaintiff's private facts claim must also fall under the College's HCQIA immunity. Accordingly, in line with Congress's intent, the Court should dispense with Plaintiff's claims as quickly as possible.

**IV.    Plaintiff's Private Facts Claim (Count IV) Has No Basis in Fact or Law Because it is Based on Facts That Were Not Private.**

Plaintiff's claim for private facts against the College (Count IV) is demonstrably false. Ironically, one of the fatal flaws in the private facts claim is entirely of Plaintiff's doing. In order to plead a private facts claim, plaintiff must plead and prove that: (1) publicity was given to private facts, (2) the facts were private and not public facts, and (3) the matter made public would be highly offensive to a reasonable person. *Miller v. Motorola, Inc.*, 202 Ill. App. 3d 976, 978, 560 N.E.2d 900, 902 (1st Dist. 1990) (*citing* W. Prosser, Torts, at 856 (5th ed. 1984)). There is no right to privacy for matters within public knowledge. *See Leopold v. Levin*, 45 Ill. 2d 434, 442, 259 N.E.2d 250, 255 (1970) (stating that "[n]o right of privacy attached to matters

14

associated with [plaintiff's ] participation in that highly publicized crime"); *Oden v. Cahill*, 79 Ill. App. 3d 768, 771-72, 398 N.E.2d 1061, 1063-64 (1st Dist. 1979) (noting that "the right to privacy should not be distorted by invoking it to keep private that information which already is, or can be made, public"). Here, Plaintiff put the facts at issue in the public domain.

Plaintiff claims that, on June 13, 2007, Dr. Kenneth Jones approached him at a medical conference in San Diego and Dr. Jones "stated to Kamelgard that he had heard and was told that the College had dropped its investigation and proceedings against him, and inquired if that was true." (Compl. ¶ 29.) According to Plaintiff, College "publicized information about the investigation into the allegations against Plaintiff in a way that Jones and other members of the ASBS were able to learn of them despite the fact that such proceedings were confidential." (Compl. ¶ 47.) "The investigation of the allegations against Plaintiff and the College's charging him with violations of its rules were private and not public facts." (Compl. ¶ 48.) This is false. Plaintiff himself publicly disseminated facts about his peer review when, on March 30, 2007, he filed the Petition and voluntarily inserted details about his case into the public record. In the Petition, Plaintiff discussed the investigation (Ex. C, Verified Petition for Discovery Before Suit ¶¶ 5-7, 9) and the charges (*id* ¶ 8). Plaintiff simply cannot pursue a private facts claim when he publicized all the facts at issue. *See Chisholm v. Foothill Capital Corp.*, 3 F. Supp. 2d 925, 940 (N.D. Ill. 1998); *Wynne v. Loyola Univ. of Chicago*, 318 Ill. App. 3d 443, 453, 741 N.E.2d 669, 677 (Ill. App. 2000).

## CONCLUSION

For the reasons set forth herein and in the accompanying Motion, the American College of Surgeons respectfully requests that this Court grant its motion and dismiss Counts II and IV of Plaintiff's Complaint with prejudice.

Respectfully submitted,

AMERICAN COLLEGE OF SURGEONS

/s/ Steven P. Mandell

Steven P. Mandell (ARDC No. 6183729)
Steven L. Baron (ARDC No. 6200868)
Natalie A. Harris (ARDC No. 6272361)
Mandell Menkes LLC
333 West Wacker Drive, Suite 300
Chicago, IL 60606
Telephone: (312) 251-1000
Facsimile: (312) 251-1010

August 29, 2008

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

JOSEPH KAMELGARD,

    Plaintiff,

        v.

THE AMERICAN COLLEGE OF
SURGEONS, JOHN DOES "A", "B",
AND "C" AS AGENTS OF THE ACS,
and JERZY MACURA,

    Defendants.

No.

```
FILED: JUNE 3, 2008
08CV3211          LI
JUDGE    CONLON
MAGISTRATE    JUDGE DENLOW
```

## COMPLAINT AND JURY DEMAND

    Plaintiff, Joseph Kamelgard, through his attorneys, Miles Zaremski and Myron Mackoff, as his complaint against the defendants states as follows:

## ALLEGATIONS COMMON TO ALL COUNTS

### I.    JURISDICTION AND VENUE

    1.  This matter is brought pursuant to 28 U.S.C.A. 1332(a)(1) between citizens of different states, as thus there exists diversity jurisdiction among the parties and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

    2.  Venue is proper in this District pursuant to 28 U.S.C.A. 1391(b) because Defendant, American College of Surgeons, resides in this District and because circumstances for this action arose in this District.



## II.   PARTIES

3.      Plaintiff, Joseph Kamelgard ("Kamelgard") is a medical doctor and surgeon who is a citizen of the State of New Jersey.

4.      The American College of Surgeons ("ACS") is a not-for-profit corporation incorporated under the laws of the State of Illinois, whose principle place of business is in Chicago, Illinois, and is therefore a citizen of the State of Illinois pursuant to 28 U.S.C.A. 1332 (C)(1).

5.      The ACS has an entity called the Central Judiciary Committee ("CJC").  The CJC, according to the ACS website, "is a Regental Committee which has general supervision and direction of disciplinary matters under the Board of Regents.  Members of the CJC are appointed by the Board of Regents...." The members of the CJC at all relevant times to this complaint were: Arnold Brent Eastman of San Diego, California, Martin Bruce Camins of New York, New York, Carlos A. Pellegrini of Seattle, Washington, John Thomas Preskitt of Dallas, Texas, and Thomas V. Whalen of Allentown, Pennsylvania (collectively, the "CJC members").

6.      On information and belief, the CJC members meet in this district, in Chicago, Illinois at the offices of the ACS to conduct and transact the official business of their committee, including activity that pertained to a complaint filed in 2006 against Kamelgard.

7.      The identity of John Does "A", "B' and "C" are unknown to Kamelgard to date, but that at all relevant times, and on information and belief, they were physicians and surgeons and members of the ACS who reside and are engaged in their profession in

2

one or more states, but who submitted their opinions and findings to the ACS' CJC in this

district, in Chicago, Illinois as a result of being asked to undertake this activity by one or

more employees or agents of the ACS in this district, in Chicago, Illinois.

8.    Paul Collicott, M.D. ("Collicott") is a medical doctor, who is employed by the

ACS as its Director of Member Services.

9.    Per deposition testimony Collicott gave on November 13, 2007 in the case of

*Joseph Kamelgard, M.D. vs. the American College of Surgeons*, Dkt. No. 003322 (Circuit

Court of Cook County, Chicago, Illinois) ("state court litigation"), due to the lack of

expertise and background in bariatric surgery by the CJC members, he had, or cause to

be, assigned in this district, in Chicago, Illinois, the investigation of a complaint filed

against Kamelgard by an unknown individual in or about March, 2006 to a group of three

bariatric surgeon-members of the ACS. In his deposition, Collicott described them as

consultants to the CJC. ACS refuses to disclose the identities of these three individuals,

and they remain unknown to Kamelgard to date, despite his attempts to obtain them

through the state court litigation. For the present, they are identified for purposes of this

litigation as "John Does "A", "B", and "C", who are the ones Collicott had specifically

assigned to investigate Kamelgard and make written findings to the CJC.

10.    As of this filing, the state court litigation is on appeal to the Illinois Appellate

Court, First District, Dkt. No. 08-0342.

11.    Despite his requests and those of his lawyer to the ACS as early as April,

2006 but no later than at or about December 21, 2006, Kamelgard has yet to know who

filed a complaint against him with the ACS. Kamelgard presumptively believes as of

3

June 13, 2007, however, that it may be, on information and belief, a Jerzy Macura, M.D., who at the time was Director of Bariatric Surgery, Maimondes Medical Center, Brooklyn, New York ("Macura").

12.    On information and belief, Macura is believed to be a citizen of the State of New York, who may have written and authored a communication concerning Kamelgard to the ACS in the State of Illinois, addressed his communication to the ACS in the State of Illinois, sent it by US Mail or other delivery service with the intent that it be delivered to the ACS in the State of Illinois, and intended that it be published in the State of Illinois, at the ACS headquarters in Chicago, Illinois. Further on information and belief, Macura may not have been a member of the ACS when his communication was published.

13.    Macura was a defendant in a medical malpractice lawsuit in federal court in Brooklyn, New York in which Kamelgard was retained and testified as a medical expert on behalf of the plaintiff within a month or so before the case was scheduled for trial. The case was *Newman vs. Staten Island University Hospital and Macura*. Kamelgard was retained by the New York City law firm of Queller, Fisher, Dienst, Serrins, Washor & Kool, LLP and he rendered a report to its attorney, a Mr. Maiorana, on November 2, 2005 as well. This report did not come into existence until long after that lawsuit was filed, and this case was the first in which Kamelgard had ever given a deposition or provided testimony in court.

14.    On April 5, 2006, Kamelgard received from Collicott a letter in which Collicott stated, "...we have received a complaint regarding your behavior as an expert witness in the Newman v. Staten island Hospital, et al. lawsuit filed in the U.S. District

4

Court, Eastern District of New York, docket number 98 CV 4121. Specifically, the complaint alleges you were not actively involved in the clinical practice of the specialty matter of the case during the time the testimony was provided. If the allegation is true that would constitute a violation of Statement 8: Statement on the physician acting as an expert." This letter does not identify the complainant. Correspondence and phone conversation(s) are exchanged thereafter between Kamelgard and the ACS regarding these allegations.

15.     Sometime after April 5, 2006, the complaint was assigned to the CJC members for follow-up, with, without, or at the direction of, Collicott.

16.     During a telephone conversation with Collicott occurring on June 6, 2006, Kamelgard was informed of the underlying process of how the CJC reviews and follows up on complaints lodged against ACS members. Collicott told Kamelgard that it was just routine, that he should submit his letter detailing facts from his perspective, that the matter would be reviewed in a strictly confidential manner, that the CJC would recruit the opinions of three independent bariatric surgeons over that summer, and that it should all be put to rest at the October, 2006 meeting of the CJC. Kamelgard also asked Collicott if he could be present at the meeting, but was told that he could not. His presence at a meeting would only be offered if he were formally charged with one or more violations of the ACS bylaws, and that that meeting would be a required hearing.

17.     On October 26, 2006, Kamelgard received a letter from Thomas R. Russell, MD, FACS and ACS' Executive Director ("Russell"). In this letter, the ACS formally charged Kamelgard with violations of Article VII, Sections 1(f) and (i) of the ACS bylaws. These sections provided, according to the letter, (f) Unprofessional conduct; and

5

(i) Participating in communications to the public which convey false, untrue, deceptive, or misleading information through statements, testimonials, photographs, graphics, or other means, or which omit material information without which the communication is deceptive. The letter went on to say that the matter would be considered by the CJC at its February 9, 2007 meeting in Chicago. Kamelgard was invited to have legal counsel represent him if he chose to do so. Russell fails to identify the complainant. The letter also referenced protections afforded by the Health Care Quality Improvement Act of 1986, 42 USC 11112(b)(3) ("HCQIA"). On information and belief, it is presumed that the ACS believes itself to be an entity under the umbrella of HCQIA.

18. On information and belief, some time prior to October 26, 2006, again, the CJC through Collicott assigned the investigation and preparation of findings related to the complaint filed against Kamelgard to the three specific physician/surgeon-members of the ACS either having background in bariatric surgery or who have specialized in the field of bariatric surgery, but all of whom purportedly met the criteria Kamelgard was accused of failing to meet.

19. In the trial against Macura in New York federal court, Macura never challenged the testimony of Kamelgard as not being in compliance with the standards for expert testimony set forth under the U.S. Supreme Court case of *Daubert v. Merrell Dow*, nor under the Federal Rules of Evidence adopting and incorporating the *Daubert* standard. Macura also never moved to have stricken Kamelgard's deposition or trial testimony against him.

20. On November 27, 2006, Collicott wrote Kamelgard in reply to Kamelgard's request for confirmation of ACS' disciplinary process. In this letter, Collicott stated that

6

the evidence against Kamlelgard only consisted of Kamelgard's November 30, 2005 trial testimony, his November 16, 2005 deposition testimony, and his letter to Mr. Maiorana dated November 2, 2005. Again, Collicott failed to identify the identity of the complainant.

21.    Sometime after October 26, 2006 but before December 12, 2006, Kamelgard retained legal counsel, Miles J. Zaremski ("Zaremski"), now of the Zaremski Law Group. Zaremski wrote a letter of introduction to Russell on December 12, 2006. Zaremski asked for a brief delay to respond to the charges, which Kamelgard was given as December 20, 2006.

22.    On December 15, 2006, Zaremski spoke with an Ellen Waller ("Waller"), the Administrator for ACS' CJC. An extension was given to January 8, 2007 to respond to the charges asserted by the ACS against Kamelgard. However, on December 21,2006, Zaremski wrote Waller a six page letter with attachments. The letter referenced a phone call with Waller wherein she was asked for a copy of the complaint against Kamelgard; she refused, asserting that it was ACS policy to provide only a summary of the charges. She would also not identify the person who filed the charges against Kamelgard. One of the attachments to this complaint was a reproduction of court filings which showed that Macura had been made a party defendant in 33 other cases which appeared to be medical malpractice cases in New York courts.

23.    On December 29, 2007, Waller wrote Zaremski to say she had received Zaremski's December 21, 2006 letter, that Collicott would present Zaremski's December 21, 2006 letter to the CJC at its February 9, 2007 meeting, the hearing on the charges against Kamelgard would not proceed on February 9, 2007, and that "we will notify you

7

as to whether it will be deferred until the June 8, 2007 CJC meeting following the meeting in February."

24.    On January 5, 2007, Zaremski wrote Waller again, this time with a three-page letter, with six Exhibits attached.

25.    In Zaremski's letter to Russell of December 12, 2006, Zaremski offered to confer with "the ACS" to try and reach an amicable resolution "short of any hearing or further administrative action." No written response was ever sent in reply by Russell or anyone else representing the ACS. However, Waller told Zaremski during one of their communications with one another that once formal charges of bylaws violations are made against a Fellow member of the ACS, there is no mechanism to "shortcut" the process of having a formal hearing proceed.

26.    In fact, no hearing ever took place, so Kamelgard was left without any opportunity to defend himself against allegations that only Collicott generally summarized in earlier correspondence to Kamelgard. Such hearings are critically important, for if there is an adverse outcome for the respondent physician, such a physician is not only subject to sanctions by the organization, but also such sanctions, on information and belief, may be reported to the federal National Practitioner's Data Bank under the HCQIA law, as well as the New Jersey State Board of Medical Examiners which licenses Kamelgard.

27.    On March 2, 2007, Kamelgard received a letter from Eastman, which stated, in part, "After due process and discussion the (CJC) Committee voted to take no further action with regard to this matter." This letter never neither stated to which matter is

8

referred nor that the formal charges against Kamelgard were being dropped, nor that

Kamelgard's conduct as charged did not violate ACS rules or bylaws, nor that there was

no finding of any wrongdoing on the part of Kamelgard. Up until, and after, this time,

Kamelgard was never provided with the identity of his accuser, a copy of the complaint

filed against him or the identity of the three bariatric surgeons (or their findings) who

were assigned to investigate him and then make their findings known to the CJC.

Moreover, the proceedings of the CJC were to be kept confidential per ACS' policies and

procedures, and per what Collicott told Kamelgard on June 6, 2006. Further, no other

materials of substance had been presented to the CJC on Kamelgard's behalf, other than

the letters Zaremski wrote on December 21, 2006 and January 5, 2007, from the time it

charged Kamelgard until this March 2, 2007 letter.

28.　During the Collicott deposition on November 13, 2007 in the state court

litigation, ACS' lawyer, Marc Steven Silver ("Silver"), admitted (at p. 121, ll. 5-6 of the

deposition transcript) that the ACS through Collicott has never revealed to Kamelgard

who submitted the complaint against him.

29.　Kamelgard attended meetings of the American Society for Bariatric Surgery

("ASBS")[1], in San Diego, California in June, 2007. During these meetings, at the

opening welcome reception on Wednesday evening, June 13, 2007, Kenneth Jones, M.D.

("Jones"), who was unrelated to the ACS' CJC, Collicott or the three consulting bariatric

surgeons, asked to speak with Kamelgard in private at which time he stated to Kamelgard

that he had heard and was told that the ACS had dropped its investigation and

---

[1]　The ASBS is now known as the American Society for Metabolic and Bariatric Surgery ("ASMBS"),
although for purposes of this complaint, it will be referred to as the ASBS.

proceedings against him, and inquired if that was true. The ACS had previously communicated to Kamelgard that, consistent with ACS' policies and procedures, the charges and investigation against him were to be handled confidentially.

30.    On information and belief, this inquiry stemmed from public disclosure of the investigation and charging by one or more of the members of the CJC, John Does A, B and/or C, Collicott and/or others within the ACS who would be privy to such information.

31.    On June 13, 2007, Jones also advised Kamelgard that Macura had filed a complaint against Kamelgard, but with the ASBS, a year or so before, and the ASBS's Ethics and Advisory Committee had initiated an investigation of its own in June, 2006. Kamelgard was completely unaware of this ASBS investigation and the letter until this private conversation with Jones on June 13, 2007.

32.    On July 11, 2007, Kamelgard received a cover page communication via facsimile from Jones at Kamelgard's address in Paramus, New Jersey. Jones is, or had been, Chair of the Professional Conduct Subcommittee of the Ethics and Advisory Committee of the ASBS. Attached to this cover page was a letter Jones sent to Kamelgard dated June 21, 2006, enclosing a copy of a letter of 1 March, 2006 that Macura had sent to the ASBS in Gainsville, Florida. Macura complained about Kamelgard's testimony in the medical malpractice lawsuit against Macura and the Staten Island University Hospital. Jones' letter of June 21, 2006 was addressed to Kamelgard at "P.O. Box 1709, Newark, NJ 07101-1709", and was evidently sent by Jones from Shreveport, La., and not from the ASBS offices in Florida.

33.    Kamelgard never received Jones' letter with the Macura letter, as mailed on or about June 21, 2006, because Kamelgard does not, and has never, lived in Newark,

10

New Jersey, nor has he ever had a mailing address to which the Jones' letter was addressed and sent at the time. Again, the first time that Kamelgard ever saw the Jones' letter of June 21, 2006 with the Macura letter enclosure was when Jones sent it all to Kamlegard via facsimile on July 11, 2007.

34. Moreover, the first time that Kamelgard reasonably became aware that perhaps it was Macura who filed a complaint against him with the ACS was on July 11, 2007, when Kamelgard received the Jones' letter with the Macura letter of March 1, 2006 attached and addressed to the ASBS.

35. On information and belief, presuming it was Macura who filed a writing with the ACS regarding Kamelgard arising from his (Kamelgard's) participation as an expert witness for the plaintiff in the *Newman v. Staten Island University Hospital* case, Macura's writing was intended to be received at ACS headquarters in this district in Chicago, Illinois, was addressed to the ACS in this district in Chicago, Illinois, and was published in this district in Chicago, Illinois.

## COUNT I
## DEFAMATION *PER SE* (MACURA)

36. On information and belief, and better known to defendants, based on information discovered by Plaintiff on June 13, 2007 from his discussion with Jones, Defendant Macura submitted a letter to the ACS imputing that Plaintiff was unable to perform his duties as a physician, lacked integrity as a physician, or lacked ability as a physician.

37. On information and belief, the statements contained in the Macura letter to the ACS identified in paragraph 36, above, were false and Macura knew they were false or made with a reckless disregard for whether they were false or not.

11

38.     On information and belief, the statements contained in the Macura letter to
the ACS identified in paragraph 36, above, were made with actual malice and written and
communicated with the sole intent to willfully and wantonly harm Kamelgard in his
person, reputation and profession, so that his reputation was lowered in the eyes of the
community or to deter third persons, such as physicians, from associating with him.

39.     The Macura letter of March 1, 2006 to the ASBS, (attached hereto and
incorporated by reference herein as Exhibit A) which Plaintiff first discovered on June
13, 2007, contained false statements, which Macura knew were false or that he made with
a reckless disregard for whether they were false or not.

40.     The Macura letter of March 1, 2006, was intentionally and maliciously
written and not otherwise privileged or subject to a qualified privilege or made in good
faith, not based on fact or subject to an innocent construction.

41.     The Macura letter of March 1, 2006 was made with actual malice and written
and communicated with the sole intent to willfully and wantonly harm Kamelgard in his
person, reputation and profession, so that his reputation was lowered in the eyes of the
community or to deter third persons, such as physicians, from associating with him.

WHEREFORE, for all of the foregoing reasons, Plaintiff Joseph Kamelgard prays
that judgment be entered against Defendant Macura on this Count I, that compensatory
damages be assessed in a sum to be determined at trial in excess of $75,000 plus costs,
expenses and fees, and that the Court assess punitive damages against Defendant Macura
and for other and further relief that this court deems just.

## COUNT II
## DEFAMATION *PER SE* (ACS AND ITS AGENTS)

12

42.    On information and belief, those facts better known to Defendants, the ACS, through its agents, the CJC members, John Does "A", "B' and "C", and/or Collicott, wrongfully accused, investigated and, on information and belief, made findings not capable of an innocent construction that Kamelgard violated its rules and conduct thereby imputing that Plaintiff was unable to perform his duties as a physician, lacked integrity as a physician, or lacked ability as a physician.

43.    On information and belief, those facts better known to Defendants, the ACS, through its agents, the CJC members, John Does "A", "B' and "C", and/or Collicott, published these false accusations concerning Kamelgard in his person, reputation and profession so that his reputation was lowered in the eyes of the community or deterred third persons, such as physicians, from associating with him, and caused him damage.

WHEREFORE, for all of the foregoing reasons, Plaintiff Joseph Kamelgard prays that judgment be entered against Defendants ACS, and John Does "A", "B' and "C" on this Count II, that compensatory damages be assessed in a sum to be determined at trial in excess of $75,000 plus costs, expenses and fees, and for other and further relief that this court deems just.

## COUNT III
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (MACURA)

44.    By sending defamatory letters to ACS and the ASBS, Macura's conduct was extreme and outrageous.

45.    By sending the defamatory letters to the ACS and the ASBS, Macura intended to cause Plaintiff emotional distress or knew there was a high probability that his actions would cause Plaintiff severe emotional distress.

13

46.     By sending the defamatory letters to the ACS and the ASBS, Macura has

willfully and wantonly caused Plaintiff severe emotional distress that has required

Plaintiff to seek medical and psychiatric care.

WHEREFORE, for all of the foregoing reasons, Plaintiff Joseph Kamelgard prays

that judgment be entered against Defendant Macura on this Count III, that compensatory

damages be assessed in a sum to be determined at trial in excess of $75,000 plus costs

expenses and fees, and that the Court assess punitive damages against Defendant Macura

and for other and further relief that this court deems just.

## COUNT IV
## INVASION OF PRIVACY
## (ACS AND ITS AGENTS)

47.     On information and belief, the ACS and/or its agents, publicized information

about the investigation into the allegations against Plaintiff in a way that Jones and other

members of the ASBS were able to learn of them despite the fact that such proceedings

were confidential.

48.     The investigation of the allegations against Plaintiff and the ACS's charging

him with violations of its rules were private and not public facts.

49.     The matters made public by the ACS and/or its agents were offensive to a

reasonable person.

50.     The matters made public by the ACS and/or its agents about the investigation

into the allegations against Plaintiff were not of legitimate public concern.

WHEREFORE, for all of the foregoing reasons, Plaintiff Joseph Kamelgard prays

that judgment be entered against Defendants ACS and John Does "A", "B" and "C" on

14

this Count IV, that compensatory damages be assessed in a sum to be determined at trial

in excess of $75,000 plus costs expenses and fees, and for other and further relief that this

court deems just.

## COUNT V
## FALSE LIGHT INVASION OF PRIVACY
## (MACURA)

51.    Macura's statements to the ACS and ASBS placed Plaintiff in a false light.

52.    The false light in which Plaintiff was placed would be offensive to a

reasonable person.

53.    When Macura made the statements that placed Plaintiff in a false light, he

knew they were false or made them with a reckless disregard for whether they were true

or not

WHEREFORE, for all of the foregoing reasons, Plaintiff Joseph Kamelgard prays

that judgment be entered against Defendant Macura on this Count V, that compensatory

damages be assessed in a sum to be determined at trial in excess of $75,000 plus costs

expenses and fees, and that the Court assess punitive damages against Defendant Macura

and for other and further relief that this court deems just.

### JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully submitted,

__/s/ Myron Mackoff____
Attorney for plaintiff

15

Myron Mackoff
407 S. Dearborn St., Suite 1310
Chicago, IL 60605
Tel. (312) 922-5236
Atty. Bar No 6225518

Myles Zaremski
Zaremski Law Group
707 Skokie Blvd.
Suite 600
Northbrook, Illinois 60062

FROM :   08CV3211          FAX NO. :                    Jul. 11 2007 12:03PM  P3

JUDGE    CONLON

MAGISTRATE   JUDGE DENLOW

Maimonides Medical Center
548 46th Street Second Floor
Brooklyn, New York 11231
718 283-7425
718 635-7525 Fax

Jerry Mecora, MD and Richard Lazzard, MD

Department of Surgery

MAR 2 0 2006



# Maimonides

1 March 2006

**American Society for Bariatric Surgery**
7328 West University Avenue, Suite F
Gainesville, FL 32607

Re: Dr. Joseph Kumelgard

To the President and Membership Committee of The American Society for Bariatric Surgery:

I wish to bring to your attention the deplorable conduct of a fellow member of the society. I am obligated to discuss the disturbing fact that there are some members of our society that have no reservations in testifying against their own colleagues as long as the price is right. In this case, Dr. Joseph Kumelgard of New Jersey went even further to help a plaintiff's case, not hesitating to misrepresent the medical literature, create his own standard of care and represent himself as an expert in the field of bariatric surgery despite having almost no current surgical experience.

Recently, I went to trial in a medical malpractice lawsuit brought against me and Staten Island University Hospital which dates back to 1997. The case involved a morbidly obese 51-year-old male who underwent an open Roux-en-Y gastric bypass. The post-operative course was uneventful for the initial 36 hours, but the patient then spiked a fever to 102.6, followed by severe, foul-smelling diarrhea which continued throughout the rest of post-operative day 2. The films from the upper GI gastrograffin swallow clearly demonstrated an intact anastomosis, with a small amount of air present in the excluded stomach. Apart from the diarrhea and fever, the patient was otherwise asymptomatic; he was without pain, had good I/O levels and otherwise normal vital signs. The patient was monitored closely on the floor until he developed a drop in urine output and blood pressure. At this time, his respiration became labored prompting first a transfer to ICU, intubation and fluid challenges to address the hypotension and decreased urine output.

At the time of this surgery I had performed at least 300 gastric bypasses as lead surgeon and I have to admit that I was at a loss as to the cause of this patient's deterioration. By 12:00 noon on post-operative day 3, I decided to take him back to the operating room for exploration. In the OR, I found a massively distended stomach and swollen loops of small bowel without mechanical obstruction. I drained the stomach with a large gastrostomy tube, then closed the incis on with a large mesh suspecting abdominal compartment syndrome. Eventually the patient did well, and he was discharged three weeks later. Three days after discharge, he severed his relationship with no and had a lawyer come to his home to take pictures of his surgical hernia and open incision.

1/3
Jerry Mecora, MD

FROM :                    FAX NO :                    Jul. 11 2007 12:09PM  P4

The lawyers for the patient twice hired as expert witnesses surgeons with no bariatric surgery experience. The first expert contended that my gastric pouch was too small (it was approximately 15-20 ml in size), while the second criticized that my biliopancreatic limb was too short (the small intestine was divided 25 centimeters beyond the Ligament of Treitz). Finally, one month before trial, they succeeded in hiring Dr. Joseph Kamelgard of New Jersey.

Dr Kamelgard is a member of American Society for Bariatric Surgery and even sits on one committee (as do I). I was born and raised in Poland and attended medical school in my native country before emigrating to America; Dr. Kamelgard was born here in the United States but could not get into an American medical school. Dr. Kamelgard admitted to failing his ECFMG qualifying exam at least twice (he testified that he was not certain how many times he sat for the exam), and likewise failed his surgical boards the first time. With regard to his bariatric surgery experience, Dr. Kamelgard did not complete his formal surgical training until 1998, more than one year after the case at issue in this lawsuit. He did not become involved in bariatric surgery until the summer of 1999. In his entire career, he believes he has performed 250 bariatric cases as the lead surgeon.

After completing a laparoscopic fellowship in Texas in 1998 Dr.Kamelgard started his bariatric surgical career at University Hospital Newark, where Dr Benjamin R ush performed a large number of gastric bypasses. Still searching for a better mentor, plaintiff's expert joined a practice with Dr Rafael Cat---la, where he mastered VBG Roux-Y gastric bypass before deciding to start his own solo practice.

I feel compelled to write this letter because Dr. Kamelgard'u stified in court that even though his professional career as a bariatric surgeon began more than a year after I performed the Roux-Y procedure at issue in this lawsuit in April 1997, he declared he was competent to testify as an expert because he trained and was educated with medical literature and texts published before 1997. As an expert, Dr Kamelgard accused me of ordering the wrong test stating that the standard of care in 1997 required the performance of a CT scan with contrast of the abdomen, rather than an upper GI series. In his opinion, a CT scan of the abdomen would definitely show gastric distention, where an upper GI series would not. Dr. Kamelgard testified to this under oath yet he never bothered to review this patient's UGI films, films which clearly showed a non-distended excluded stomach. Not only did Dr. Kamelgard fail to consider these films before formulating his opinion against me in advance of trial, he and the plaintiff's lawyer decided to ignore this study at trial despite these films being present in the courtroom on the day Dr. Kamelgard testified.

Dr Kamelgard further claimed that the distended stomach should have been drained percutaneously by an Interventional Radiologist, going so far as to state that percutaneous gastrostomy was the standard of care in 1997. When Dr. Kamelgard was confronted by my attorney with Dr. Robert Brolin's peer-review article discussing the author's experience with percutaneous drainage in morbidly obese patients who had undergone gastric bypass, published in 2004 in the American Journal of Roentgenology (a study Dr. Brolin and his colleagues claimed to be the first published review of such an approach), Dr. Kamelgard claimed that since this was a radiology journal, it must be a different Robert Brolin.

I am happy to advise that I won my case, thanks at least partially to Dr. Kamelgard. What hurts me here, is that there are members [of the ASBS and diplomats of the American College of Surgeons] who have no reservations testifying against their own colleagues as long as the price is right. Since leaving his faculty position at University Hospital Newark/New Jersey Medical School as of September 2003 until he testified in Court against me on November 30, 2005 Dr. Kamelgard performed in his own words, "a handful of surgeries, maybe 3 or 4."

2/2
Jerry Naeris, MD

FROM :                                  FAX NO. :                           Jul. 11 2007 12:03PM  P5

In one month, Dr Kamelgard earned more than $25,000, incl iding $12,500 to testify against me at trial. He chose to earn his salary by misrepresenting the medical li erature and creating his own standard of care.

I am including Dr Kamelgard's initial written report, the exe mination before trial and his testimony at trial on direct and cross-examination. As a member in good tanding, I request that this testimony and expert opinion be closely reviewed, as I do not feel that after such conduct, this gentleman deserves to remain a member in good standing of this organization. I the nk you in advance for your consideration on this most serious matter. Should you require any further i iformation, do not hesitate to contact me directly.

Sincerely,

Jerzy Macura, M D.

Director of Bariatric Surgery
Maimonides M dical Center
Brooklyn, New York

# EXHIBIT B



American College of Surgeons

# American College of Surgeons Bylaws

(As last amended by the Board of Regents at its February 2007 meeting )

I. The College
Section 1. Fellows
Section 2. Honorary Fellows
Section 3. Other Categories of Membership
Section 4. Resignation
Section 5. Dues and Assessments
Section 6. Meetings
Section 7. Quorum

II. Board of Regents
Section 1. Management
Section 2. Membership
Section 3. Vacancies
Section 4. Meetings
Section 5. Quorum

III. Board of Governors
Section 1. Membership
Section 2. Terms and Vacancies
Section 3. Meetings
Section 4. Duties
Section 5. Quorum

IV. Officers of the College
Section 1. Composition
Section 2. Election and Appointment
Section 3. President
Section 4. First Vice-President
Section 5. Second Vice-President
Section 6. Treasurer
Section 7. Secretary of the College
Section 8. Chair and Vice-Chair of the Board of Regents
Section 9. Chair and Vice-Chair of the Board of Governors
Section 10. Secretary of the Board of Governors
Section 11. Attendance at Regents' Meetings
Section 12. Executive Director
Section 13. Chief Financial Officer

V. Committees and Advisory Councils
Section 1. Standing Committees and Councils
Section 2. Executive Committee
Section 3. Central Judiciary Committee
Section 4. Member Services Liaison Committee
Section 5. Finance Committee
Section 6. Notice of Meetings
Section 7. Quorum

VI. Committees on Nominations
Section 1. Board of Regents
Section 2. Board of Governors
Section 3. Fellows

VII. Maintenance of Fellowship and Membership
Section 1. Discipline
Section 2. Disciplinary Procedure
Section 3. Discontinuance of Practices or Non-Payment of Dues or Assessments
Section 4. Termination of Fellowship

VIII. Miscellaneous
Section 1. Local Chapters
Section 2. Annual Sessions
Section 3. Adjournment of Meetings
Section 4. Indemnification of Regents and Officers
Section 5. Legal Action Against the College

IX. Amendment of Bylaws

## I. The College

### Section 1. Fellows

Fellows of the American College of Surgeons shall be graduates of medical schools acceptable to the College, who are licensed to practice medicine in their respective states, provinces, or countries, who have been elected to Fellowship by the Regents, and who continue to meet the qualification requirements from time to time established by the Regents. A Fellow of the College is considered to be either active or retired. Fellows of the College who have discontinued the practice of medicine may, upon request, be granted retired status



Section 2. Honorary Fellows

The Regents may elect as Honorary Fellows individuals who: (a) possess an international reputation in the field of surgery or medicine, or (b) have rendered distinguished humanitarian services, especially in the field of medical science. Honorary Fellows shall not be required to pay fees or dues but shall enjoy all of the privileges of the Fellows except that they shall not have the right to vote or to hold office. Optimally, Honorary Fellowship should be conferred in person. However, under exceptional or extraordinary circumstances, other methods for presentation may be considered and approved by the Honors Committee.

Back to top

Section 3. Other Categories of Membership

(a) Associate Fellows: Associate Fellows shall be graduates of medical schools acceptable to the College, who have completed an accredited surgical residency in the United States of America or Canada, who meet and continue to meet the qualification requirements from time to time established by the Board of Regents, and who have been endorsed after evaluation by the Division of Member Services or by the Member Services Liaison Committee.

(b) Residents: Resident Members shall be graduates of medical schools acceptable to the College, who meet and continue to meet the qualification requirements from time to time established by the Board of Regents, and who have been endorsed after evaluation by the Division of Member Services or by the Member Services Liaison Committee.

(c) Affiliates: Affiliate membership is available to physicians and non-physicians in the health care field. Applications for membership must be submitted with a reference letter from a Fellow of the American College of Surgeons along with the application fee, a copy of the applicant's current license, and/or a copy of the applicant's current certification.

(d) Medical Students: Medical Student Members shall be enrolled in a U.S. medical school accredited by the Liaison Committee on Medical Education (LCME) or accredited Canadian medical schools. Along with the application fee, the surgery department's Chair must sign the application or submit an accompanying letter verifying the student's enrollment.

Back to top

Section 4. Resignation

Resignations from Fellowship shall be effective only upon acceptance by the Board of Regents.

Back to top

Section 5. Dues and Assessments

The Fellows and other members shall pay such annual or other dues or assessments as may from time to time be determined by the Board of Regents.

Fellows are not charged dues if: (a) they are 65 or more years of age; or (b) they have been granted retired status.

A request for retired status will be granted, or a resignation accepted, only if the Fellow has fulfilled all dues or assessment responsibilities. Continued delinquency in payment of dues or assessments after submission of a request for retired status or a resignation will result in termination of Fellowship.

New Fellows who are 60 or more years of age are to remain in the active dues-paying status until an equivalent of five years in annual dues is paid. The dues may be paid on an annual basis or in a lump sum, according to the New Fellow's preference.

Back to top

Section 6. Meetings

The Annual (regular) Business Meeting of Members shall be held between September 1 and December 31 each year, at a time and place designated by the Board of Regents. Special meetings may be called at any time by the President, the Board of Regents, or by a written call signed by not less than five hundred (500) Fellows or other members. Written or printed notice of the time and place of any regular or special meeting shall be given by mail,

or other means permitted by law, to each member at the member's address as shown on the records of the College [not less than ten (10) nor more than forty (40) days before the date of special meetings].

Back to top

### Section 7. Quorum

The Fellows present at any meeting of members shall constitute a quorum at such meeting.

Back to top


## II. Board of Regents

### Section 1. Management

The management and control of the business and affairs of the College shall be vested in the Board of Regents.

Back to top

### Section 2. Membership

The Board of Regents shall consist of twenty-two (22) Regents. The Board of Governors shall, at each annual meeting of the Governors, elect Fellows as Regents, each to serve for a term of three (3) years. Not less than two (2) of the twenty-one (21) Regents so elected shall be from Canada. The President of the College shall be the twenty-second member of the Board of Regents. No Regent shall be elected for more than three (3) terms in succession.

Individuals who are no longer in active, surgical practice shall not be nominated for an initial term on the Board of Regents. If a Regent retires from active, clinical practice while serving on the Board, he/she shall not be nominated for reelection when the current term expires.

Back to top

### Section 3. Vacancies

Vacancies in the Board of Regents shall be filled from among Fellows by the Board of Governors at the next meeting of the Governors following the occurrence of the vacancy. Any Fellow elected to fill a vacancy shall serve an initial three-year term.

Back to top

### Section 4. Meetings

A regular meeting of the Board of Regents shall be held annually at a time and place designated by the Board of Regents in conjunction with the Clinical Congress. It is anticipated that two additional regular meetings shall be held annually, one in February or March, and one in May or June. Special meetings may also be called by the Chair of the Board of Regents upon request signed by not less than fifty (50) members of the Board of Governors or by ten (10) members of the Board of Regents. Not less than ten (10) days' notice of the time and place of any regular or special meetings shall be given to each Regent at the Regent's address as shown on the records of the College.

Back to top

### Section 5. Quorum

Ten (10) members of the Board of Regents shall constitute a quorum for the transaction of business at any meeting of the Board.

Back to top

## III. Board of Governors

### Section 1. Membership

The Board of Governors shall consist of: (a) not more than one hundred fifty (150) Governors-at-Large, comprising one for each state and Canadian province, and such additional Governors from states or provinces, in general proportion to the number of Fellows residing therein, as may be determined from time to time by the Board of Governors; (b) one or more Governors from each commonwealth of the United States and from each country in which a chapter exists or where at least fifteen (15) Fellows from that country request a Governor; and (c) Governors nominated by the executive committee or policy-making body of surgical associations and societies, and by federal medical services as determined from time to time by the Board of Governors. Every chapter in each state, province, commonwealth, and country can recommend candidates for Governor.

Back to top

### Section 2. Terms and Vacancies

Governors shall serve for a term of three (3) years and, as nearly as may be practicable, one-third of the total membership of the Board of Governors shall be elected at each Annual Business Meeting of Members. Interim vacancies in the Board of Governors shall be filled by election at the next meeting of the members following the occurrence of such vacancies, and Governors elected to fill such vacancies shall serve a full three-year term. No Governor shall be elected for more than two (2) terms in succession. Election to a second term will be based on effective participation in the activities of the College and the Board of Governors.

Back to top

### Section 3. Meetings

The annual meeting of the Board of Governors shall be held at a time and place designated by the Board of Regents in conjunction with the Clinical Congress. Special meetings shall be called by the Chair of the Board of Governors at the request of the Board of Regents or upon request signed by not less than fifty (50) Governors, and may also be called by the Chair of the Board of Governors with the approval of the Executive Committee of the Board of Governors. Not less than ten (10) days' notice of the time and place of any regular or special meeting shall be given by mail, or other means permitted by law, addressed to each Governor at the Governor's address as shown on the records of the College.

Back to top

### Section 4. Duties

The Governors shall act as a liaison between the Board of Regents and the Fellows, and as a clearinghouse for the Regents on general assigned subjects and on local problems. They shall attend Convocations and other formal meetings of the Fellows and the Governors. They shall aid in the establishment of chapters of the College, be ex officio members of the governing group of the chapter and of the local Committee on Applicants, aid in the selection of the personnel of committees organized within their areas, aid in investigating special cases of applicants for Fellowship, and shall perform such other duties as may be assigned to them by the College or by the Board of Regents. They shall, upon request of the Regents, render reports on their local activities and on the College situation in their areas.

Back to top

### Section 5. Quorum

Fifty (50) members of the Board of Governors shall constitute a quorum for the transaction of business at any meeting of the Board.

Back to top

## IV. Officers of the College

### Section 1. Composition

The officers of the College shall consist of the President, First Vice-President, Second Vice-President, Treasurer,

and Secretary of the College; the Chair and Vice-Chair of the Board of Regents; the Chair, Vice-Chair, and Secretary of the Board of Governors; the Executive Director, and the Chief Financial Officer

Back to top

**Section 2. Election and Appointment**

The President-Elect, First Vice-President-Elect, and Second Vice-President-Elect shall be elected annually by the Fellows and shall be inaugurated during the Clinical Congress next following their election  They shall serve until their respective successors are elected and have qualified

The Treasurer, Secretary, Executive Director, and Chief Financial Officer of the College shall be appointed by the Board of Regents and shall serve at the pleasure of the Board of Regents

A vacancy in any office of the College (with the exception of the offices of the Board of Governors) shall be filled by the Board of Regents, except as otherwise provided in these Bylaws  Officers appointed to fill vacancies shall serve for the unexpired portion of the term of their respective predecessors  The Executive Committee of the Board of Regents may, however, appoint temporary officers to hold office until the next meeting of the Board of Regents  All vacancies in the offices of the Board of Governors shall be filled by the Executive Committee of the Board of Governors

Back to top

**Section 3. President**

The President shall preside at all meetings of the Fellows of the College and at all Convocations for the conferring of Fellowships, and shall perform such other duties as may be assigned by the Board of Regents. The President shall also be an ex officio member of the Board of Regents, the Executive Committee of the Board of Regents, the Finance Committee, and the Board of Governors

Back to top

**Section 4. First Vice-President**

The First Vice-President shall, in the absence or inability to act of the President, preside at all meetings of the Fellows of the College and perform the duties and exercise the powers of the President, and shall succeed to the presidency if such office becomes vacant before the expiration of the term, and shall be invited to attend all meetings of the Board of Regents except executive sessions (to which this officer may be invited by the Board of Regents)

Back to top

**Section 5. Second Vice-President**

The Second Vice-President shall, in the absence or inability to act of the President and of the First Vice-President, preside at all meetings of the Fellows of the College and perform the duties and exercise the powers of the President and shall be invited to attend all meetings of the Board of Regents except executive sessions (to which this officer may be invited by the Board of Regents)

Back to top

**Section 6. Treasurer**

The Treasurer shall oversee, in conjunction with the Chief Financial Officer, the funds of the College under the supervision of the Finance Committee, and shall make such reports to the Finance Committee, the Executive Committee of the Board of Regents, and the Board of Regents as may be required by them  The College shall purchase a bond or insurance coverage insuring the faithful performance of the duties of the office of Treasurer. In the absence or inability to act of the Treasurer, the duties of the Treasurer shall be performed by such person and in such manner as the Finance Committee may direct.

Back to top

**Section 7. Secretary of the College**

The Secretary shall oversee the minutes of the meetings of the Fellows, give notices in accordance with the

provisions of law and the Bylaws, keep the records and corporate seal, and perform such other duties as may from time to time be assigned by the Board of Regents.

Back to top

## Section 8. Chair and Vice-Chair of the Board of Regents

The Board of Regents shall annually elect a Regent to act as Chair of the Board, to serve until a successor is elected and has qualified. The Chair shall preside at all meetings of the Regents and execute all duties delegated by the Regents. A Vice-Chair shall be elected in the same manner who, in the absence or inability to act of the Chair, shall perform the duties of the Chair.

Back to top

## Section 9. Chair and Vice-Chair of the Board of Governors

The Board of Governors shall annually elect a Governor to act as Chair of the Board, to serve until a successor is elected and has qualified. The Chair shall preside at all meetings of the Governors and execute all duties delegated by the Governors. A Vice-Chair shall be elected in the same manner who, in the absence or inability to act of the Chair, shall perform the duties of the Chair.

Back to top

## Section 10. Secretary of the Board of Governors

The Secretary of the Board of Governors shall be elected annually by the Governors and shall serve until a successor is elected and has qualified. The Secretary shall keep the minutes of the meetings of the Governors, serve on the Finance Committee of the Board of Regents, see that all notices are given in accordance with the actions of the Governors, and perform such other duties as may from time to time be assigned by the Board of Governors.

Back to top

## Section 11. Attendance at Regents' Meetings

The Chair, Vice-Chair, and Secretary of the Board of Governors; and the Treasurer, Secretary, President-Elect, and Executive Director of the College shall be invited to attend all meetings of the Board of Regents except executive sessions, to which any or all of these officials may be invited by the Board of Regents.

Back to top

## Section 12. Executive Director

The Executive Director shall have general charge of all matters of the College under the direction of the Board of Regents. The Executive Director may appoint and remove divisional or other directors and other executive-level staff other than the Chief Financial Officer with the advice and consent of the Board of Regents, may direct such divisional or other directors and other executive-level staff, and may appoint, direct, and remove other employees of the College. The Executive Director shall also arrange for the annual Clinical Congress and other meetings; coordinate the action of all standing committees; attend all meetings of the Board of Regents, all meetings of the Executive Committee of the Board of Regents, and executive sessions upon invitation, and all meetings of the Board of Governors; and be responsible for the care and protection of all property of the College not otherwise provided for by the Bylaws. The Board of Regents shall determine by resolution from time to time the signature authority of the Executive Director and other officers and staff members of the College with respect to contracts and other documents to be executed on behalf of the College. The Executive Director shall function as Secretary of the Board of Regents and submit to the Board of Regents at least thirty (30) days in advance of its annual meeting, a written report on the operations and of the business of the College for the preceding year, together with recommendations for the succeeding year. In the absence or inability to act as the Executive Director, the duties of the Executive Director shall be performed by such person and in such manner as the Board of Regents may direct.

Back to top

## Section 13. Chief Financial Officer

The Chief Financial Officer shall be chosen by the Board of Regents upon consultation with the Executive Director. The Chief Financial Officer shall be the principal accounting and financial officer of the College and

shall maintain its financial records, which shall be audited annually by a competent firm of certified public accountants. The College shall purchase a bond or insurance coverage insuring the faithful performance of the duties of Chief Financial Officer. The Chief Financial Officer shall also supervise methods and procedures relating to revenues and expenditures, including purchasing, and shall be responsible for the care and maintenance of the property of the College. The Chief Financial Officer shall in general perform all duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned by the Executive Director or the Board of Regents.

Back to top


# V. Committees and Advisory Councils

### Section 1. Standing Committees and Councils

The standing committees and councils of the College shall include an Advisory Council to the Board of Regents, an Executive Committee, Central Judiciary Committee, Member Services Liaison Committee and Finance Committee of the Board of Regents; an Executive Committee of the Board of Governors; and such other committees and councils as the Board of Regents may from time to time appoint. The members of all standing committees and councils, except the Executive Committee of the Board of Governors, and the Member Services Liaison Committee shall be elected by the Board of Regents.

Back to top

### Section 2. Executive Committee

(a) Board of Regents: The members of the Executive Committee of the Board of Regents shall consist of the Chair and Vice-Chair of the Board of Regents, the President of the College, and three (3) other Regents elected by the Board of Regents. The President-Elect may be invited to attend as a guest at the discretion of the Chair of the Board of Regents. The members of this Executive Committee shall serve until their respective successors are elected and have qualified. The Chair of the Board of Regents shall be the Chair of this Committee. During the intervals between meetings of the Board of Regents, the Executive Committee shall exercise the powers of the Board of Regents in the management and direction of the business and the conduct of the affairs of the College, except that it shall not have power to elect Fellows; amend the Bylaws; or regulate fees, dues, or assessments. It shall keep a record of its proceedings and shall, after each meeting, report the same to the Regents for approval at the next succeeding meeting of the Board of Regents.

(b) Board of Governors: The members of the Executive Committee of the Board of Governors shall consist of the Chair, Vice-Chair, and Secretary of the Board of Governors, and four (4) other Governors, to be elected by the Board of Governors, two (2) each year for a term of two (2) years.

Back to top

### Section 3. Central Judiciary Committee

The Central Judiciary Committee shall consist of five (5) Fellows, at least three (3) of whom shall be members of the Board of Regents. Members of the Central Judiciary Committee shall be elected by the Board of Regents and shall serve until their respective successors are elected and have qualified. The Central Judiciary Committee shall have general supervision and direction of disciplinary matters under the Board of Regents.

Back to top

### Section 4. Member Services Liaison Committee

The Member Services Liaison Committee members are selected annually by the Chair of the Board of Regents upon consultation with the Executive Director. The Member Services Liaison Committee shall advise the Board of Regents on applications for ACS membership, revisions to membership requirements, and matters related to dues and status changes. The Member Services Liaison Committee has oversight responsibilities for all credentials committees that the Board of Regents may establish for the purpose of membership application review.

Denials of application for Fellowship may be appealed. To initiate an appeal, the applicant must submit a written request to the Executive Director. The Chair of the Board of Regents shall appoint an Appeals Panel, consisting of three Fellows who have previously served on the Member Services Liaison Committee. The decision of the Appeals Panel shall be presented to the Board of Regents. The final decision of the Board of Regents shall be binding.

Back to top

### Section 5. Finance Committee

The Finance Committee shall consist of the Chair of the Board of Regents, the President, the Treasurer of the College, the Secretary of the Board of Governors and the President-Elect, and three (3) Fellows elected by the Board of Regents to serve until their respective successors are elected and have qualified. The Chair of the Board of Regents shall be Chair of the Finance Committee. The Finance Committee shall have general supervision and direction of the financial affairs of the College under the Board of Regents. It shall have power to invest the funds of the College; to sell, transfer, and convey any securities and property, other than real estate, of the College; and to execute necessary and proper instruments of transfer and conveyance. The Finance Committee shall designate the depositories in which the moneys and securities of the College shall be deposited, supervise and direct the Treasurer and the Chief Financial Officer, report at least once a year to the Regents and Fellows with respect to the financial condition of the College, and have the books and accounts of the College annually audited by a licensed firm of Certified Public Accountants who shall report to the Board of Regents.

Back to top

### Section 6. Notice of Meetings

Meetings of all standing committees may be held on five (5) days' notice given to each member personally or by mail, or other means permitted by law.

Back to top

### Section 7. Quorum

A majority of the members of any committee shall constitute a quorum for the transaction of business at any meeting. The act of a majority of those present at any regularly called committee meeting, when a quorum is present, shall be the act of that committee, except that the Central Judiciary Committee may act only by the vote of a majority of all its members at a regularly called meeting.

Back to top

## VI. Committees on Nominations

### Section 1. Board of Regents

(a) The Board of Regents shall have a Nominating Committee consisting of three (3) Regents appointed by the Chair to recommend candidates for the offices of Chair and Vice-Chair of the Board of Regents and of Secretary and Treasurer of the College. In addition, the Nominating Committee will recommend members for the following standing committees of the Board of Regents: the Central Judiciary Committee, the Executive Committee, and the Finance Committee.

(b) The Board of Regents shall appoint a committee of four (4) members to consist of three (3) Past Presidents and/or Regents and the Chair of the Board of Regents to meet with and advise the Nominating Committees of the Board of Governors and the Fellows. This committee shall be called the Advisory Committee on Nominations of the Board of Regents.

Back to top

### Section 2. Board of Governors

A Nominating Committee of the Board of Governors, consisting of five (5) members of the Board, shall be appointed annually to make nominations for: (a) election to the Board of Regents, and (b) officers of the Board of Governors. The Executive Committee of the Board of Governors shall nominate four (4) members and three (3) alternate members of this Nominating Committee for election by the Board of Governors. The Chair of the Board of Governors shall appoint the fifth member, who shall be its Chair, and shall designate one of the members elected by the Board of Governors as Vice-Chair.

This Nominating Committee shall meet regularly with the Advisory Committee on Nominations of the Board of Regents during the selection process and will consult with the Nominating Committee of the Fellows prior to submitting its nominations to the Board of Governors at its annual meeting in the year following the appointment of this committee.

Additional nominations for election to the Board of Regents or for officers of the Board of Governors may be made from the floor at the annual meeting of the Board, provided that such nominations have been submitted in writing to the Secretary of the Board of Governors, signed by twenty-five (25) or more members of the Board, not less than forty-eight (48) hours prior to such annual meeting.

Back to top

**Section 3. Fellows**

A Nominating Committee of the Fellows, five (5) in number, shall be appointed annually to make nominations for: (a) election to the offices of President-Elect, First Vice-President-Elect, and Second Vice-President-Elect of the College, and (b) election to the Board of Governors. This Committee shall be appointed by the President of the College, the Chair of the Board of Regents, and the Chair of the Board of Governors, acting jointly.

The nominations of this committee for election to the Board of Governors shall be made after due consideration of recommendations submitted by College chapters, and in some cases by local or provincial nominating committees, with respect to Governors referred to in Section 1 (a) of Article III; from local chapters or individual Fellows with respect to Governors referred to in Section 1 (b) of Article III; and from surgical associations or federal medical services with respect to Governors referred to in Section 1 (c) of Article III.

This committee shall meet with and advise the Nominating Committee of the Board of Governors and the Advisory Committee on Nominations of the Board of Regents, prior to submitting its nominations to the next annual meeting of Fellows following the appointment of this committee.

Additional nominations for President-Elect, First Vice-President-Elect, and Second Vice-President-Elect may be made from the floor at the annual meeting of Fellows, provided that such nominations have been submitted in writing to the Secretary of the College, signed by one hundred (100) or more Fellows, not less than forty-eight (48) hours prior to such annual meeting.

Back to top

# VII. Maintenance of Fellowship and Membership

**Section 1. Discipline**

The Board of Regents may expel, call for the resignation of, or otherwise discipline any Fellow or member if a majority of all of the members of the Board of Regents shall find the conduct of the Fellow or member has been injurious to the good order, peace, reputation, or best interest of the College, or is derogatory to its dignity, inconsistent with its purposes, or shows a failure to maintain the standards of conduct set forth in the Fellowship Pledge.

Without limiting the generality of the foregoing, the following shall in each case be considered to be conduct or conclusive evidence of conduct injurious to the best interest of the College and inconsistent with its purposes:

(a) Conviction of a felony or of any crime relating to or arising out of the practice of medicine, or involving moral turpitude.

(b) Limitation or termination of any right associated with the practice of medicine in any state, province, or country, including the imposition of any requirement for surveillance, supervision, or review, by reason of violation of a medical practice act or other statute or governmental regulation, disciplinary action by any medical licensing authority, entry into a consent order, or voluntary surrender of license.

(c) Improper financial dealings, including the payment or acceptance of rebates of fees for services or appliances, and the charging of exorbitant fees, or engaging in any activities which put personal financial consideration above the welfare of patients.

(d) Participating in the deception of a patient.

(e) Performance of unjustified surgery.

(f) Unprofessional conduct.

(g) The performance of surgical operations (except on patients whose chances of recovery would be prejudiced

by removal to another hospital) under circumstances in which the responsibility for diagnosis or nonoperative care of the patient is delegated to another who is not fully qualified to undertake it

(h) Failure or refusal to cooperate reasonably with an investigation by the College of a disciplinary matter

(i) Participating in communications to the public which convey false, untrue, deceptive, or misleading information through statements, testimonials, photographs, graphics, or other means, or which omit material information without which the communication is deceptive

Back to top

## Section 2. Disciplinary Procedure

Disciplinary questions shall be investigated by or under the supervision of the Executive Director. Any case which in the opinion of the Executive Director may warrant further consideration of disciplinary action shall be referred to the Central Judiciary Committee. If the Central Judiciary Committee decides that no disciplinary action should be taken, it shall so advise the Executive Director. If the Central Judiciary Committee decides that disciplinary action should be taken in any case, its recommendation as to the action to be taken shall be submitted in writing to the Board of Regents

The Central Judiciary Committee shall not make a recommendation for disciplinary action with respect to a Fellow or member unless written notice shall have been sent to the Fellow or member by registered or certified mail, or by any other means of delivery that provides the College with evidence of receipt, not less than thirty (30) days prior to a meeting of the committee: (a) stating the time and place of such meeting, and (b) informing the Fellow or member that disciplinary action will be considered at such meeting and offering the Fellow or member an opportunity to appear in person with counsel if so desired and to submit such evidence as the Fellow or member deems proper to show that disciplinary action should not be taken. At the conclusion of the meeting of the Central Judiciary Committee, a written recommendation for disciplinary action will be forwarded to the Board of Regents for consideration and final action. The Board of Regents may adopt or reject the recommendation of the Central Judiciary Committee or may impose such other disciplinary action as it deems appropriate.

The Fellow or member will be notified of the final action taken by the Board of Regents in writing within thirty (30) days after the Board meeting. The notice will be mailed to the Fellow or member by registered or certified mail, or by any other means of delivery that provides the College with evidence of receipt. The Fellow or member will have thirty (30) days to request reconsideration, and may, within such thirty (30) day period, submit additional written information for review and consideration. The Chair of the Board of Regents and the Chair of the Central Judiciary Committee will review any material submitted and will determine if reconsideration by the full Board is warranted. The Fellow or member will be notified of their final determination, and any additional disciplinary proceedings or determinations, by certified or registered mail or by any other means of delivery that provides the College with evidence of receipt. Without limiting the generality of the foregoing, upon the recommendation of the Central Judiciary Committee, the Board of Regents may temporarily suspend a Fellow or member charged under any of subsections (a) through (i) of Section 1 above at any time, pending completion of the disciplinary process described herein.

Regents who are members of the Central Judiciary Committee shall not be disqualified by reason of their membership in such committee from voting on any matter presented to the Board of Regents by the Central Judiciary Committee.

The Board of Regents may transmit the results of a disciplinary proceeding or any information obtained in the course of an investigation or hearing concerning a Fellow or member, with or without a recommendation, to any medical licensing authority.

Back to top

## Section 3. Discontinuance of Practice or Non-Payment of Dues or Assessments

Anything in this Article VII to the contrary notwithstanding, the Board of Regents may terminate the membership of any Fellow:

(a) If such Fellow is, for any reason other than retirement, no longer involved in any aspect of surgery or the surgical specialty under which the Fellow is qualified for Fellowship, provided that such Fellow shall be given adequate opportunity to present to the Board of Regents such facts as the Fellow considers sufficient to justify the continuance of membership; or

(b) If a Fellow is delinquent in the payment of Fellowship dues or assessments one (1) year or more and has, upon notice by certified mail, failed to present a satisfactory and acceptable explanation for such delinquency to the Finance Committee.

Back to top

### Section 4. Termination of Fellowship

A Fellow who has resigned, been terminated, or suspended from membership in the College shall forthwith return to the College the certificate of Fellowship and all other indicia of Fellowship previously received from the College, unless otherwise directed by the Board of Regents, and shall not purport or pretend to be a current Fellow of the American College of Surgeons. This obligation may be enforced by an action for specific enforcement in an appropriate court.

Back to top

## VIII. Miscellaneous

### Section 1. Local Chapters

Local chapters may be organized under regulations established by the Board of Regents for the purpose of furthering the objectives of the College. The chapters shall be distributed geographically within cities, states, provinces, countries, or other areas, and shall perform such duties as may, from time to time, be determined by the Board of Regents.

(a) Chapter officers and councils should encourage Fellows practicing within their geographic area to become members of the chapter. Membership in the chapter will provide a means for maintaining a close relationship with local Fellows of the College and opportunities to inform Fellows of the objectives and activities of the College.

(b) Residents and Associate Fellows should be included in the affairs of the chapter. They should also be encouraged to participate in the scientific programs of the chapters.

(c) Chapters shall attempt to assure high standards of professional conduct in their area.

(d) Each chapter shall be organized as a separate legal entity. The College shall not be liable for the debts and obligations of any chapter.

Back to top

### Section 2. Annual Sessions

At the time and place of the Annual Business Meeting of Members, there shall be held:

(a) The Clinical Congress, which shall consist among other sessions of: (1) surgical and diagnostic demonstrations, and (2) scientific and literary papers concerning or relating to the art and science of surgery; and

(b) The Convocation of the College, at which approved applicants for Fellowship and Honorary Fellows-Elect shall be admitted to the College.

Back to top

### Section 3. Adjournment of Meetings

In the event that a quorum shall not be present at any duly called meeting of the Board of Regents, the Board of Governors, or any standing committee or council, a majority of the members present and entitled to vote may adjourn from time to time to reconvene without further notice than that contained in the resolution of adjournment.

Back to top

### Section 4. Indemnification of Regents and Officers

Regents or officers, or former Regents or officers, of the College shall be indemnified by the College against expenses actually and necessarily incurred in connection with the defense or settlement of any action, suit, or proceeding to which they are made a party by reason of being or having been a Regent or officer of the College,

except in relation to matters as to which any such Regent or officer, or former Regent or officer, shall be adjudged in such action, suit, or proceeding to be liable for willful misconduct in the performance of duty and to such matters as shall be settled by agreement predicated on the existence of such liability, and except as provided in this Section 4.

Indemnification hereunder shall be provided only in the event that the Board of Regents determines that the person to be indemnified acted in good faith and in a manner which that person reasonably believed would be in the best interest of the College

Any Regent whose entitlement to indemnification is involved in such a determination shall be disqualified from voting thereon. In the event that a majority of the Board of Regents is disqualified from voting on any determination affecting indemnification, then such determination shall be made by the Board of Governors of the College.

The right of indemnification herein provided shall not be exclusive of any other rights to which any Regents or officers, or former Regents or officers, of the College may be lawfully entitled. If any provision or provisions of this section shall be determined to be in violation of applicable law, then such provision or provisions shall be deemed null and void, but all other provisions hereof shall be given full effect to the extent consistent with applicable law

Back to top

## Section 5. Legal Action Against the College

Any action brought in law or in equity against the College, including any action relating to membership, shall be brought in the courts, federal or state, and shall be governed by the laws of the state in which the principal office of the College is situated

Back to top

# IX. Amendment of Bylaws

These Bylaws may be amended by a majority vote of all of the members of the Board of Regents at any duly convened regular or special meeting. These Bylaws may also be amended by a majority vote of all the Fellows, who may vote either in person or by proxy, at any duly convened regular or special meeting, provided that the substance of the proposed amendment or amendments shall have been stated in the call of the meeting at which such action is to be taken.

Back to top

*Revised July 7, 2008*

**This page and all contents are Copyright © 1996-2008**
**by the American College of Surgeons, Chicago, IL 60611-3211**

# EXHIBIT C

In The Circuit Court of Cook County
County Department, Law Division

Joseph Kamelgard, M.D.

        Petitioner

        Vs

American College of Surgeons

        Respondent

2007L003322
CALENDAR/ROOM H
TIME 00:00
Discovery

### Verified Petition For Discovery Before Suit

Comes now this Petitioner, Joseph Kamelgard, M.D., by and through his counsel, Miles J. Zaremski of Zaremski Law Group and Ellis M. Sostrin & Associates, P.C., and states as follows:

1.     Petitioner, Joseph Kamelgard, M.D. ("Petitioner") is initiating this action pursuant to Illinois Supreme Court Rule 224.

### Background

2.     Petitioner is a duly licensed physician practicing in the State of New Jersey.

3.     Respondent is a professional organization with its principal offices located in Chicago, Illinois.

4.     Respondent is composed of duly qualified physicians and surgeons, one of which is Petitioner.

EXHIBIT
C

5.    On or about April 5, 2006, Petitioner received a letter from Paul E. Collicott, MD, FACS, Director of Member Services, American College of Surgeons. A copy of this letter is attached as Exhibit "A". As Exhibit A indicates, a complaint was filed against Petitioner regarding Petitioner's behavior as an expert witness in the case of Newman  v.  Staten  Island Hospital, et al., Petitioner was never provided a copy of this complaint, though he had requested it. However, Petitioner appropriately responded to Exhibit "A".

6.    On October 26, 2006, Petitioner received a letter from Thomas R. Russell, MD, FACS and Executive Director, American College of Surgeons. A copy of this letter is attached as Exhibit "B". In this letter, Petitioner was advised that the complaint against Petitioner was forwarded to Respondent's Central Judiciary Committee ("CJC"), and that "after due process, the CJC has recommended proceeding with this matter."

7.    On information and belief, Respondent's CJC has a panel of up to three physicians who review materials in order to make a determination whether or not the CJC should proceed with a violation of its bylaws or not.  Petitioner was never provided with the identity of these physicians.

8.    Respondent charged Petitioner with unprofessional conduct and participating in communications to the public which convey false, untrue, deceptive, or misleading information, as more fully set forth in Exhibit "B".

9.    Per Exhibit "B", Petitioner was told to appear at a hearing to be convened on February 9, 2007, "with counsel should you choose to be represented", and in order "to submit evidence as you deem proper to show that disciplinary action should not be taken against you."

10.    Respondent is an entity coming within the Health Care Quality Improvement Act of 1986, 42 USC 11112, *et seq.* including its reporting requirements.

11.    Thereafter, Petitioner retained legal counsel to protect his interests.

12.    Petitioner's legal counsel submitted a document, dated December 21, 2006, and is attached as Exhibit "C". Thereafter, Petitioner was notified through his legal counsel that Respondent postponed the hearing on February 9, 2007 to, at the earliest, June 8, 2007. A second document was submitted to Respondent, dated (sic) January 5, 2006. This document, less its exhibits, is attached as Exhibit "D". Exhibit "D" was slightly modified in a letter, dated January 8, 2007. This letter is attached as Exhibit "E".

13.    After submissions of Exhibits "C"-"E", Petitioner did not hear from Respondent, until its letter of March 2, 2007, attached as Exhibit "F". Exhibit "F" states no further action will be taken by Respondent against Petitioner for the charges Respondent intended to pursue against Petitioner (see Exhibit "B").

14.    As a result of the complaint filed against Petitioner, and the potential adverse findings of such a complaint, including the reporting of an adverse finding to the practitioner's data bank under HCQIA, Petitioner has been damaged and caused to expend monies he ordinarily would not have had to do, if Respondent undertook a careful, prudent and reasonable investigation prior to submitting Exhibit "B" to Petitioner.

II.

### Relief Sought

Petitioner seeks the identity of those physicians delegated by Respondent and/or its CJC

to investigate the complaint lodged against Petitioner, as well as any and all documentation generated by these physicians, containing their findings, recommendations, conclusions and investigation. Petitioner further requests the contact information of each of these physicians, in order to depose one or more of them, for the purpose of ascertaining the identities of those who may be responsible in damages to Petitioner, including his reputation, professional standing and/or his financial interests.

Respectfully submitted,

ZAREMSKI LAW GROUP
by Miles J. Zaremski

ELLIS M. SOSTRIN & ASSOCICATES, P.C.
by Ellis M. Sostrin

ZAREMSKI LAW GROUP
Attorney for Petitioner
707 Skokie Boulevard, Suite 600
Northbrook, Illinois 60062
(847) 418-3830
Atty No.: 43545

ELLIS M. SOSTRIN & ASSOCIATES, P.C.
2 N. LaSalle Street, Suite 1606
Chicago, Illinois 60602
(312) 346-3580
Atty No.: 26164

STATE OF ILLINOIS )
                      )
COUNTY OF COOK )

       I certify that I am duly authorized to act on behalf of the Petitioner in the above entitled

action, and that, under penalties as provided by law pursuant to 735 ILCS 5/1-109, I certify that

the statements set forth in the Verified Petition for Discovery Before Suit are true and correct to

the best of my knowledge, in formation and belief.

                                      ZAREMSKI LAW GROUP
                                      by Miles J. Zaremski

ZAREMSKI LAW GROUP
Attorney for Petitioner
707 Skokie Boulevard, Suite 600
Northbrook, Illinois 60062
(847) 418-3830
Atty No.: 43545



# American College of Surgeons

633 N Saint Clair St     Voice: 312/202-5000     e-mail: postmaster@facs.org
Chicago, IL 60611-3211     Fax: 312/202-5001     ACS Web site: http://www.facs.org

*Officers*
*President*
Kathryn D. Anderson, MD, FACS
San Marino, CA
*President-Elect*
Edward M. Copeland III, MD, FACS
Gainesville, FL
*First Vice-President*
J. Patrick O'Leary, MD, FACS
New Orleans, LA
*Second Vice-President*
William F. Sasser, MD, FACS
St. Louis, MO
*First Vice-President-Elect*
David L. Nahrwold, MD, FACS
Chicago, IL
*Second Vice-President-Elect*
Robert E. Berry, MD, FACS
Roanoke, VA
*Secretary*
John O. Gage, MD, FACS
Pensacola, FL
*Treasurer*
John L. Cameron, MD, FACS
Baltimore, MD
*Executive Director*
Thomas R. Russell, MD, FACS
Chicago, IL
*Comptroller*
Gay L. Vincent, CPA
Chicago, IL

*Board of Regents*
*Chair*
Gerald B. Healy, MD, FACS
Boston, MA
*Vice-Chair*
Mary H. McGrath, MD, FACS
San Francisco, CA
Kathryn D. Anderson, MD, FACS
San Marino, CA
H. Randolph Bailey, MD, FACS
Houston, TX
Barbara L. Bass, MD, FACS
Houston, TX
L. D. Britt, MD, FACS
Norfolk, VA
Bruce D. Browner, MD, FACS
Farmington, CT
Martin B. Camins, MD, FACS
New York, NY
A. Brent Eastman, MD, FACS
La Jolla, CA
Richard J. Finley, MD, FACS
Vancouver, BC
Josef E. Fischer, MD, FACS
Boston, MA
Barrett G. Haik, MD, FACS
Memphis, TN
Alden H. Harken, MD, FACS
Oakland, CA
Charles D. Mabry, MD, FACS
Pine Bluff, AR
Jack W. McAninch, MD, FACS
San Francisco, CA
Robin S. McLeod, MD, FACS
Toronto, ON
Carlos A. Pellegrini, MD, FACS
Seattle, WA
Karl C. Podratz, MD, FACS
Rochester, MN
John T. Preskitt, MD, FACS
Dallas, TX
J. David Richardson, MD, FACS
Louisville, KY
Thomas V. Whalen, MD, FACS
New Brunswick, NJ

*Board of Governors*
*Chair*
Mark A. Malangoni, MD, FACS
Cleveland, OH
*Vice-Chair*
Mary Margaret Kemeny, MD, FACS
Jamaica, NY
*Secretary*
Julie A. Freischlag, MD, FACS
Baltimore, MD

April 5, 2006

Joseph I. Kamelgard, MD, FACS
58 Crystal Avenue
West Orange, New Jersey  07052

PERSONAL & CONFIDENTIAL

Dear Dr. Kamelgard:

    The College routinely receives inquiries and complaints about members from individuals. In that regard we have received a complaint regarding your behavior as an expert witness in the <u>Newman v. Staten Island Hospital, et al</u> lawsuit filed in the U.S. District Court, Eastern District of New York, docket number 98 CV 4121. Specifically, the complaint alleges that you were not actively involved in the clinical practice of the specialty matter of the case <u>during the time the testimony was provided</u>. If this allegation is true that would constitute a violation of Statement 8: Statement on the physician acting as an expert witness (copy enclosed).

    After reviewing this information I would appreciate receiving information from you with regard to this matter. You may direct your response to me at the address above.

Sincerely,

*PE Collicott*

Paul E. Collicott, MD, FACS
Director of Member Services

FOUNDED BY SURGEONS OF THE UNITED STATES AND CANADA. 1913
*The American College of Surgeons is an Equal Opportunity/Affirmative Action Employer*



EXHIBIT A



# American College of Surgeons

633 N Saint Clair St
Chicago, IL 60611-3211

Voice: 312/202-5000
Fax: 312/202-5001

e-mail: postmaster@facs.org
ACS Web site: http://www.facs.org

**Officers**
*President*
Kathryn D. Anderson, MD
San Marino, CA
*President-Elect*
Edward M. Copeland III, MD, FACS
Gainesville, FL
*First Vice-President*
J. Patrick O'Leary, MD, FACS
New Orleans, LA
*Second Vice-President*
William F. Sasser, MD, FACS
St. Louis, MO
*First Vice-President-Elect*
David L. Nahrwold, MD, FACS
Chicago, IL
*Second Vice President-Elect*
Robert E. Berry, MD, FACS
Roanoke, VA
*Secretary*
John O. Gage, MD, FACS
Pensacola, FL
*Treasurer*
John L. Cameron, MD, FACS
Baltimore, MD
*Executive Director*
Thomas R. Russell, MD, FACS
Chicago, IL
*Comptroller*
Gay L. Vincent, CPA
Chicago, IL

*Board of Regents*
*Chair*
Gerald B. Healy, MD, FACS
Boston, MA
*Vice-Chair*
Mary H. McGrath, MD, FACS
San Francisco, CA
Kathryn D. Anderson, MD, FACS
San Marino, CA
H. Randolph Bailey, MD, FACS
Houston, TX
Barbara L. Bass, MD, FACS
Houston, TX
L. D. Britt, MD, FACS
Norfolk, VA
Bruce D. Browner, MD, FACS
Farmington, CT
Marlin B. Camins, MD, FACS
New York, NY
A. Brent Eastman, MD, FACS
La Jolla, CA
Richard J. Finley, MD, FACS
Vancouver, BC
Josef E. Fischer, MD, FACS
Boston, MA
Barrett G. Haik, MD, FACS
Memphis, TN
Alden H. Harken, MD, FACS
Oakland, CA
Charles D. Mabry, MD, FACS
Pine Bluff, AR
Jack W. McAninch, MD, FACS
San Francisco, CA
Robin S. McLeod, MD, FACS
Toronto, ON
Carlos A. Pellegrini, MD, FACS
Seattle, WA
Karl C. Podratz, MD, FACS
Rochester, MN
John T. Preskitt, MD, FACS
Dallas, TX
J. David Richardson, MD, FACS
Louisville, KY
Thomas V. Whalen, MD, FACS
New Brunswick, NJ

*Board of Governors*
*Chair*
Mark A. Malangoni, MD, FACS
Cleveland, OH
*Vice-Chair*
Mary Margaret Kemeny, MD, FACS
Jamaica, NY
*Secretary*
Julie A. Freischlag, MD, FACS
Baltimore, MD

October 26, 2006

**VIA Federal Express**

Joseph I. Kamelgard, MD, FACS
58 Crystal Avenue
West Orange, New Jersey

**PERSONAL & CONFIDENTIAL**

Dear Dr. Kamelgard:

Following your June 6, 2006 response to Dr. Collicott's inquiry to you about a complaint concerning your testimony as an expert witness in the <u>Newman v. Staten Island Hospital</u> lawsuit, the matter was forwarded to the Central Judiciary Committee (CJC) for review at their meeting earlier this month. After due process, the CJC has recommended proceeding with this matter.

In light of this information, you are hereby charged with violation of Article VII, Sections 1(f) and (i) of the *Bylaws* of the College, a copy of which is enclosed. Article VII, Sections 1(f) and (i) provides that the following may be cause for disciplinary action:

> (f)   *Unprofessional conduct*

> (i)   *Participating in communications to the public which convey false, untrue, deceptive, or misleading information through statements, testimonials, photographs, graphics, or other means, or which omit material information without which the communication is deceptive.*

This matter will be considered on Friday, February 9, 2007, in Chicago, Illinois by the Central Judiciary Committee (CJC). You are invited to appear, with counsel should you choose to be represented, and to submit such evidence as you deem proper to show that disciplinary action should not be taken against you. At the hearing, you will be extended appropriate protections of the Health Care Quality Improvement Act of 1986, 42 USC 11112(b)(3), Subsection (c), a copy of which is enclosed. No other witnesses are expected to testify.

FOUNDED BY SURGEONS OF THE UNITED STATES AND CANADA, 1913
*The American College of Surgeons Is an Equal Opportunity/Affirmative Action Employer*


EXHIBIT
B



Joseph I. Kamelgard, MD, FACS
October 26, 2006
Page 2

        If you intend to be present, please return the enclosed form to Ellen
Waller, the Administrator for the CJC,  no later than Wednesday December
20, 2006, so that time can be scheduled for your appearance.   Any written
material which you wish to have distributed to the members of the CJC should
also be in Ellen's hands no later than December 20, 2006.

                                    Sincerely,

                                    Thomas R. Russell, MD, FACS
                                    Executive Director


            Enclosures

# KAMENSKY RUBINSTEIN HOCHMAN & DELOTT, LLP

AN LLP INCLUDING PROFESSIONAL CORPORATIONS

SUITE 200

7250 NORTH CICERO AVENUE

LINCOLNWOOD, ILLINOIS 60712-1693

(847) 982-1776

FACSIMILE: (847) 982-1676
WWW.KR-LAW.COM

MILES J. ZAREMSKI
(847) 568-5602
E-MAIL: mzaremski@kr-law.com

SUITE 4300
30 NORTH LASALLE STREET
CHICAGO, ILLINOIS 60602
TELEPHONE (312) 368-1776
TELEPHONE (312) 807-3960

December 21, 2006

**VIA FACSIMILE & U.S. MAIL**
Ms. Ellen Waller
Administrator, Central Judicial Committee
American College of Surgeons
633 N. Saint Clair Street
Chicago, Illinois 60611-3211

Re:    Joseph Kamelgard, MD, FACS/Newman v. Staten Island Hospital

Dear Ms. Waller:

I have now reviewed necessary correspondence and other materials supplied to me by Dr. Kamelgard, and referenced by you in our phone conversation last Friday. Thank you again for your courtesies.

My attention is drawn principally to three documents:

1.    Dr. Collicott's April 5, 2006 letter to Dr. Kamelgard.

2.    Dr. Russell's October 26, 2006 letter to Dr. Kamelgard.

3.    [(ST-8)] Statement on the physician acting as an expert witness (ACS, as rev'd (2/04)):

> ---the physician expert should be familiar with the standard
> of care provided at the time of the alleged occurrence and
> should be actively involved in the clinical practice of the
> specialty or the subject matter of the case during the time the
> testimony or opinion is provided.

On the phone, I asked you for a copy of the complaint against Dr. Kamelgard. You refused to provide it to me, asserting that it was ACS policy to only provide a summary of the



EXHIBIT

C

KAMENSKY RUBINSTEIN
HOCHMAN & DELOTT, LLP

Ms. Ellen Waller
December 21, 2006
Page 2

charges or allegations. You also could not identify the person who has brought these allegations against Dr. Kamelgard. Instead, you referred me to Dr. Collicott's April 5 letter.

In this April 5 letter, he states,

> Specifically, the complaint alleges that you [Kamelgard] were not actively involved in the clinical practice of the specialty matter of the case during the time the testimony was provided. If this allegation is true, that would constitute a violation of Statement 8
> . . .

In his October 26 letter to Dr. Kamelgard, Dr. Russell states, "After due process, the CJC has recommended proceeding with this matter." While due process is a legal concept, it is intended to give the charged ACS member certain basic, fundamental rights, including knowledge of the specific charges so alleged against him. Dr. Russell's October 26 letter does not do this; instead, it refers to the language found in Article VII, Sections 1(f) (Unprofessional conduct) and (i) (participating in communications to the public which convey false, untrue, deceptive or misleading information...). Consequently, the only charge of which Dr. Kamelgard is aware is as contained in the April 5 letter. But that letter, to reiterate, is premised only upon a charge that Dr. Kamelgard was not in the clinical practice of (bariatric surgery) when he was deposed and then testified in court -- all in November, 2005.

Attempting to meld the letters of April 5 and October 26 would mean that Dr. Kamelgard somehow provided false testimony regarding his practice as of November, 2005. That doesn't make sense; there is neither any claim of this nor that Dr. Kamelgard did not testify truthfully regarding his practice on either November 16 or November 30.

In a June 6, 2006 letter from Dr. Kamelgard to Dr. Collicott, Dr. Kamelgard outlined his professional qualifications showing he is qualified as a physician, specializing in bariatric surgery. Thus, the ACS knew, at least at this time, that Dr. Kamelgard was fully qualified to provide testimony as he did on November 16, 30, 2005. Specifically, commencing in March, 2004 (or over the 18 months prior to giving testimony), Dr. Kamelgard was appointed Chief of Bariatric Surgery at St. Joseph's Regional Medical Center in Paterson, New Jersey. Preceding this, he became a member of the American Society for Bariatric Surgery in 1999, and participated in preceptorships in this field in 1999 and 2000. He was also made Director of the Obesity Treatment Center for the University Hospital in Newark before November, 2005. He opened his private practice on September 1, 2005.

KAMENSKY RUBINSTEIN
HOCHMAN & DELOTT, LLP

Ms. Ellen Waller
December 21, 2006
Page 3

Just from the above, it is quite clear that he was practicing, in a substantial way, the clinical specialty which was the underpinning for his deposition and trial testimony in November, 2005.

If indeed we take Dr. Russell's words at face value in his October 26, 2006 letter, *viz*, that Dr. Kamelgard is being provided due process by the ACS, then the only allegation brought against him is one of not being in practice at the time he gave his testimony. There was never a charge of which Dr. Kamelgard has been made aware embedded within a complaint against him other than as just described. Consequently, on this point alone, I would ask that the ACS drop its planned hearing concerning Dr. Kamelgard, so that he does not have to incur further unnecessary time and expense, particularly coming to Chicago in February.

Concomitantly, the ACS has not provided Dr. Kamelgard with any formal charges, asserting that he testified or gave deposition testimony falsely, deceptively, untruthfully, or was in any way misleading in any of his communications. If he did, he has not been so charged; however, in any event, we make a demand upon the ACS to provide us with these charges and all the specifics surrounding these claims, if they exist. Given the record that I have reviewed so far, not to do so would not comply with the most fundamental aspects of due process and fairness.

Similarly related to the immediately preceding paragraph, I note Dr. Russell's reference in his October 26 letter that no other witnesses will be present at the hearing, except, of course, Dr. Kamelgard. Yet, Dr. Kamelgard was told this past summer by phone that the materials at issue were reviewed by a panel of three bariatric surgeons. As with neither seeing the formal charges brought against him nor knowing the identity of his accuser, Dr. Kamelgard has never seen nor been provided any work product of this panel of physicians nor been given the identity of these physicians. This does not comport with basic notions of due process either. Concomitantly, if the charge is that Dr. Kamelgard was not in practice in November, 2005, I seriously question three physicians being required to review his credentials.

Parenthetically, I do not see where the reliability of what Dr. Kamelgard had to say in his deposition or at trial was ever challenged by the party against whom Dr. Kamelgard testified. Such a challenge would have been made under the well known United States Supreme Court case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.* Thus, it is clear that the defendant doctor and his lawyer found what Dr. Kamelgard had to say in the federal court to be sound and based upon sufficient expertise, background and methodology. In line with what I have just stated is the following.

The defendant in the *Newman v. Staten Island* case is a Jerzy Macura, M.D., a physician who went to medical school in Poland (Medical School of Silesia). He completed training at

Ms. Ellen Waller
December 21, 2006
Page 4

Maimondes Medical Center and Coney Island Hospital in New York. While you have not provided the identity of the accuser, Dr. Kamelgard was told that he could "pretty well guess" the identity of this accuser. Assuming this "hint" was the defendant in the *Newman* case, Dr. Macura, we undertook a search of any malpractice case(s) in which this physician may have been involved or was/is a defendant. We found not one or two cases, but two in the United States Federal Court (Eastern Dist. of New York-Brooklyn) (including *Newman*), but also another 31 cases in New York state courts, or a total of 33! To confirm these cases, I am attaching a computerized list of them. Though we have yet to investigate these matters, the lay public would be outraged to see this number of filings involving the very same physician. However, it should be clear that Dr. Macura recognizes competent testimony when proffered against him (as Dr. Kamelgard did in the underlying case) due to these many, many filings which certainly must have included medical expert testimony. Moreover, to have spoken up as Dr. Kamelgard did in the underlying case, the public in Brooklyn and the surrounding areas was well served. It is troubling indeed for the ACS to pursue Dr. Kamelgard, given what we have discovered and made known to you in this paragraph.

Next, and earlier in this letter, I reference ACS Statement No. 8, and identified the pertinent subsection for purposes here. First, the latter is couched under the title, *"Recommended* qualifications for the physician who acts as an expert witness:" (emphasis added). Surely, a recommendation is not a mandate, and I think this is a point on which we can all agree. A recommendation is a suggested course of conduct. But more importantly, is that the subsection quoted in this section and referenced in the earlier portion of this letter provides for the following:

1.    that the ACS member be familiar with the standard of care at the time of the occurrence; and

2.    be actively involved in the clinical practice of the specialty during the time the testimony or opinion is provided.

As to point no. 2, there is no doubt Dr. Kamelgard was sufficiently well qualified in bariatric surgery as of the two dates he provided testimony. If the ACS believes otherwise, we would like to know specifically the charge against him that reflects this. Moreover, if there is a question over the word "active" (as in, actively involved in the clinical practice...), as there is no definition of it in anything ACS has authored or that Dr. Kamelgard has been given by the ACS, parameters most certainly include Dr. Kamelgard's background as of November, 2005.

As to point no.1, it is quite clear that the physician expert witness should be familiar with the standard of care at the time of the alleged occurrence. There is nothing in this wording, however, that states when this knowledge is first to be acquired, or, that the ACS member must

KAMENSEC̄H·UB̄ANN̄S·HĒLN̄
HOCHMAN & DELOTT, LLP

Ms. Ellen Waller
December 21, 2006
Page 5

be actively engaged in the clinical practice of the medical specialty at issue at the time of the occurrence from which subsequent testimony is then provided. As we know, the underlying occurrence took place in April, 1997. By the time Dr. Kamelgard provided his testimony in November 2005, he was well aware of the standards applicable in April, 1997 – which is all the ACS rule requires. Moreover, on November 3, 2006, you told Dr. Kamelgard that the ACS had no definition of Statement 8, or its subparts. Without any definitions to which his conduct must adhere, becoming familiar with the standard of care at the time of the occurrence means that: (1) the physician expert is actively involved in the practice at issue, and (2) at the time his or her opinions are provided. This is as equally a good definition as any other. Consequently, Dr. Kamelgard's testimony on November 16, 2006 and November 30, 2006 comports with point nos. 1 and 2, above.

My final point is Dr. Russell's reference to HCQIA (42 U.S.C. 11112(b)(3) contained in the October 26 letter. If one provision applies, then they all would, assuming, of course, that ACS is a health care entity under HCQIA. HCQIA is intended to ensure quality patient care. Being in clinical practice as Dr. Kamelgard was when he testified [the only allegation asserted against him] satisfies the goal of HCQIA.

Also, immunity is provided under HCQIA for the actions of a peer review entity; not the activities leading up to the action, or determination, by that entity. As I presently see the facts as presented to Dr. Kamelgard, there is a reasonable debate whether the activities undertaken by the ACS are immune, due to the following:

1. Dr. Kamelgard has not been provided with any complaint;
2. Dr. Kamelgard has not been provided with the identity of his accuser, although we believe it is a physician who has been sued 33 times;
3. This accuser, according to the ACS, has only charged Dr. Kamelgard with not being in the active practice of bariatric surgery when he testified in November, 2005;
4. This accuser, also according to the ACS, has not charged Dr. Kamelgard with giving untrue or false communications, as Dr. Russell's October 26, 2006 letter seems to indicate;
5. Dr. Kamelgard has not been provided with the identity of the members of a review panel with expertise in bariatric surgery assembled by the ACS this past summer or thereabouts;
6. Dr. Kamelgard has not been provided with the work-product/report of this review panel, in order to properly prepare himself for the February, 2007 hearing;
7. Dr. Kamelgard has been told no witnesses besides himself will be at the February, 2007 hearing, so he is unable to cross-examine those on the review panel who were sent materials to review and upon which they provided input to the CJC for

KAMENSKY RUBINSTEIN
HOCHMAN & DELOTT, LLP

Ms. Ellen Waller
December 21, 2006
Page 6

the February, 2007 hearing (*see* 42 U.S.C. 11112 (b)(3)(B(iii)); his accuser also will not be present for him to cross-examine

8. Dr. Kamelgard has not been provided with or been made aware of what communications he made which were false, untrue, misleading or deceptive; and

9. There are no definitions of terms within Statement 8, so that he knew in advance the conduct expected of him as an ACS member testifying as a physician expert.

In summary, then, Dr. Kamelgard is being "railroaded" at this juncture for a reason that cannot be found in either the clear wording of applicable ACS rules or recommendations or the only allegation made against him (April 5, 2006 letter). ACS is being led by allegations asserted by a doctor involved in 33 court cases as well.

Notwithstanding Dr. Russell's reference to due process in his October 26 letter, due process (based upon all the above) is sorely lacking. Without the necessary information, as outlined above, I do not see how we can tender an effective response by January 8, 2007 to the allegation made on April 5, 2006 in the context of the assertions made in the October 26 letter. Nonetheless, as I indicated in correspondence to Dr. Russell recently, we are willing to discuss resolution of this matter without proceeding to a hearing. Based upon that which is contained in this communication, it seems that, short of dismissing the case against Dr. Kamelgard, the ACS will be facing challenges it may not wish to undertake.

I look forward to receiving a response from you, or from another representative of the ACS. Thank you.

Very truly yours,

KAMENSKY RUBINSTEIN
HOCHMAN & DELOTT, LLP

Miles J. Zaremski

MJZ/rdw
cc:   Joseph Kamelgard, MD, FACS (email and U.S. Mail)
W:\WP51\MILES\RW1500.DOC

1 of 3 DOCUMENTS

*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY *** Copyright © 2006 CourtLink Corporation

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
(Brooklyn)

Vitta et al v. MacUra et al

PLAINTIFF: Vitta, Joseph;
    Vitta, Barbara Ann

DEFENDANT: Maimonides Medical Canter (Terminated 7/29/2004);
    MacUra, Jerzy, MD

DOCKET CASE NUMBER: 1:03cv1561

FILING DATE: 3/31/2003

JURISDICTION: Diversity

JUDGE: Trager, David G

REFERRED TO: Magistrate Judge Chrein, A Simon

NATURE OF SUIT: 362 Medical Malpractice

FILING TYPE: Civil

CAUSE: Diversity-Medical Malpractice28 USC 1332

JURY DEMAND: Defendant

PLAINTIFF ATTORNEY(S):
  O'Connor, Stephanie [COR LD NTC]
  Kurzman Karelsen & Frank
  230 Park Ave 23RD Floor
  New York, NY, USA 10169
  212-867-9500 Fax: 212-599-1759 Email: Soconnor@kurzman.com

  Ferrantelli, Victoria [COR LD NTC] (Terminated 9/20/2004)
  Kurzman Karelsen & Frank, LLP
  230 Park Avenue, 23RD Floor
  New York, NY, USA 10169
  212-867-9500 Fax: 212-599-1759 Email: Vferrantelli@kurzman.com

  Katz, Eric D [COR LD NTC]
  Nagel Rice Dreifuss & Mazie, LLP
  237 Park Avenue, 21ST Floor
  New York, NY, USA 10017
  212-551-1465 Email: Ekatz@nrdmlaw.com

Mazie, David A [COR LD NTC]
Nagel, Rice and Dreifuss
301 South Livingston Avenue
Livingston, NJ, USA 07039

DEFENDANT ATTORNEY(S):
Hauss, Karen [COR LD NTC]
Vaslas Lepowsky Hauss & Danke, LLP
201 Edward Curry Avenue Suite 200
Staten Island, NY, USA 10314
(718) 761-9300

Sullivan, James W [COR LD NTC]
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
150 East 42ND Street
New York, NY, USA 10017-5639
(212) 490-3000

THE COURT UPDATED THIS RECORD ON: 10/21/2004 12:00:00 AM

1. ARTESE, THOMAS v. MACURA, JERZY M.D., DISPOSED ON 10/17/2002; SETTLED BEFORE TRIAL, MEDICAL MALPRACTICE, 08/19/1999, 0114211999, NYRISP, RICHMOND COUNTY
    MACURA, JERZY M.D.

2. CHERVIN,SHARON v. MACURA,JERZY M.D., DISPOSED ON 10/06/2006; OTHER FINAL DISP. PRE-NOTE, MEDICAL MALPRACTICE, 03/24/2005, 0366592004, NYKISP, KINGS COUNTY
    MACURA,JERZY M.D. RICHARD ...

3. CLARK,CLAUDIA v. FERZLI,GEORGE, DISPOSED ON 04/01/2003; SETTLED DURING TRIAL, MEDICAL MALPRACTICE, 03/15/1999, 0453951998, NYKISP, KINGS COUNTY
  ... JAMES HURWITZ, JERZY MACURA, & STATEN ISLAND          UNIVERSITY ...

4. DIGIOVONNI, FRED SR. v. STATEN ISLAND, DISPOSED ON 04/13/2006; OTHER SETTLEMENT PRE-NOTE, MEDICAL MALPRACTICE, 08/17/2004, 0119882003, NYRISP, RICHMOND COUNTY
  ... P.C. AND JERZY MACURA, M.D.

5. ELBAHAR,ABRAHAM & FLORENCE v. MAIMONIDES MEDICAL CENTER, ACTIVE, MEDICAL MALPRACTICE, 06/06/2003, 0092142003, NYKISP, KINGS COUNTY
  ... CENTER AND JERZY MACURA,M.D

6. GADAEV,YAKOV v. MAIMONIDES MEDICAL CENTER, DISPOSED ON 07/29/1997; OTHER SETTLEMENT PRE-NOTE, MEDICAL MALPRACTICE, 01/02/1996, 0239811995, NYKISP, KINGS COUNTY
  ... MEDICAL CENTER JERZEY MACURA, M.D.,DAVID          STAFFENBERGM ...

7. HICKMAN,DRAYTON v. ASCHER,ENRICO, DISPOSED ON 06/27/2006; CASE DISPOSED, MEDICAL MALPRACTICE, 03/05/2004, 0288682003, NYKISP, KINGS COUNTY
  ... RICHARD SCHUTZER, JERZY MACURA, "JOHN DOE" NAME ...

8. HUDSON,TODD v. STATEN ISLAND UNIVERSITY, DISPOSED ON 09/04/2003; SETTLED BEFORE TRIAL, MEDICAL MALPRACTICE, 08/04/1999, 0092371999, NYKISP, KINGS COUNTY
  ... UNIVERSITY HOSPITAL, JERZY MACURA M.D., GEORGE          FERZLI ...

9. HUGHES,STEPHEN v. MAIMONIDES MEDICAL CENTER, DISPOSED ON 04/04/2003; VERDICT FOR DEFENDANT, MEDICAL MALPRACTICE, 01/28/2000, 0256711999, NYKISP, KINGS COUNTY
  ... MUTHUSAMY, M.D., JERSEY MACURA, M.D., SUSAN CHENG, ...

10. JURCZUK-BALESTRIERI,IWONA v. MACURA,JERZY M.D., ACTIVE, MEDICAL MALPRACTICE, 08/29/2006, 0154042006, NYKISP, KINGS COUNTY
    MACURA,JERZY M.D. JOEL ...

11. LANDAU,MOSES & BARBARA v. MACURA,JERZY M.D., DISPOSED ON 12/07/2006; OTHER FINAL DISP. PRE-NOTE, MEDICAL MALPRACTICE, 07/19/2005, 0410062004, NYKISP, KINGS COUNTY
    MACURA,JERZY M.D. ; JOSEPH ...

12. LEO,JEANNETTE A. & ALBERT A. v. MACURA,JERZY M.D., DISPOSED ON 07/29/2002; SETTLED BEFORE TRIAL, MEDICAL MALPRACTICE, 07/27/1999, 0085231998, NYKISP, KINGS COUNTY
    MACURA,JERZY M.D. MITCHELL ...

13. LOPEZ,TERESA v. MACURA,JERZY, MD, DISPOSED ON 07/08/2004; CASE DISPOSED, MEDICAL MALPRACTICE, 06/02/2004, 0132932004, NYKISP, KINGS COUNTY
    MACURA,JERZY, MD JEFFREY ...

14. LOPEZ, TERESA v. MACURA, JERZY MD ; ACTIVE, MEDICAL MALPRACTICE, 01/21/2005, 0123642004, NYRISP, RICHMOND COUNTY
    MACURA, JERZY MD. JEFFREY ...

15. LORMEL, LORRAINE v. MACURA, JERZY DR., ACTIVE, MEDICAL MALPRACTICE, 04/02/2004, 0102382004, NYRISP, RICHMOND COUNTY
    MACURA, JERZY DR. DR. ...

16. LUBACK, JACQUELINE M. v. MACURA, JERZY,, DISPOSED ON 06/22/2005; SETTLED BEFORE TRIAL, MEDICAL MALPRACTICE, 02/23/2001, 0239142000, NYSUSP, SUFFOLK COUNTY
    MACURA, JERZY, STATEN ISLAND ...

17. MACCARONE, LAWRENCE v. STATEN ISLAND UNIVERSITY, DISPOSED ON 08/12/2003; PRENOTE DISPOSITION BY MOTION, MEDICAL MALPRACTICE, 06/18/1999, 0112641999, NYRISP, RICHMOND COUNTY
    ... DRS. FERZLI AND MACURA,       GEORGE S. FERZLI AND JERZY MACURA

18. MEISEL,HARRIET v. MACURA,JERZY M.D., DISPOSED ON 11/26/2002; VERDICT FOR DEFENDANT, MEDICAL MALPRACTICE, 09/10/1996, 0179961996, NYKISP, KINGS COUNTY
    MACURA,JERZY M.D

19. MONTALBANO, FRANK ETAL. v. MACURA, JERZY MD ETAL, DISPOSED ON 09/17/2004; SETTLED DURING TRIAL, MEDICAL MALPRACTICE, 01/02/2002, 0195742001, NYQUSP, QUEENS COUNTY
    MACURA, JERZY MD ETAL & ...

20. MORACO,FRANK v. MAIMONIDES MEDICAL CENTER,, DISPOSED ON 01/28/1998; OTHER SETTLEMENT PRE-NOTE, MEDICAL MALPRACTICE, 01/31/1996, 0157361995, NYKISP, KINGS COUNTY
    ... VERRO, M.D.      JERZY MACURA, M.D, & ELIOT HOWARD ...

21. PUDELKIEWCZ,MARZENA & JAROSLAW v. MACURA,JERZY, DISPOSED ON 10/26/2001; SETTLED BEFORE TRIAL, MEDICAL MALPRACTICE, 07/27/1999, 0263861998, NYKISP, KINGS COUNTY
    MACURA,JERZY & MAIMONIDES MEDICAL ...

22. PUZO,GEORGE v. STATEN ISLAND UNIVERSITY, ACTIVE, MEDICAL MALPRACTICE, 04/18/2005, 0129812004, NYKISP, KINGS COUNTY
    ... UNIVERSITY HOSPITAL, JERZY MACURA, JEFFREY       NICASTRO, UNITED .

23. RAMSPY,SHARON v. MACURA,JERZEY M.D., DISPOSED ON 01/25/2002; OTHER FINAL DISP. PRE-NOTE, MEDICAL MALPRACTICE, 10/12/2000, 0114772000, NYKISP, KINGS COUNTY
    MACURA,JERZEY M.D. & MAIMONIDES ...

24. ROSA,MANUEL v. MAIMONIDES MEDICAL, DISPOSED ON 05/03/1999; OTHER SETTLEMENT PRE-NOTE, MEDICAL MALPRACTICE, 04/20/1998, 0237651997, NYKISP, KINGS COUNTY
    ... CENTER & JERZY M. MACURA, MD 7 MITCHELL ...

25. ROZENBERG,YAKOV v. STATEN ISLAND UNIVERSITY, DISPOSED ON 08/10/2005; OTHER SETTLEMENT PRE-NOTE, MEDICAL MALPRACTICE, 12/02/1998, 0430331998, NYKISP, KINGS COUNTY
    ... HOSPITAL AND JERZY MACURA, M.D

26. TSEYTELMAN,FIMA & ALLA v. MACURA,JERZY M.D., DISPOSED ON 12/22/1994; OTHER FINAL DISP. PRE-NOTE, MEDICAL MALPRACTICE, 01/24/1992, 0358171991, NYKISP, KINGS COUNTY
    MACURA,JERZY M.D. INDER ...

27. TURMAN,HOWARD v. MACURA,JERZY M.D.,, DISPOSED ON 04/05/2006; TRANSFER TO OTHER SUP. CT., MEDICAL MALPRACTICE, 10/29/2001, 0265392001, NYKISP, KINGS COUNTY
    MACURA,JERZY M.D., JEFFREY ...

28. VAKNIN, ZIVA v. NORTH SHORE UNIVERSITY ETAL, DISPOSED ON 09/25/2006; STRICKEN, MEDICAL MALPRACTICE, 05/15/2000, 0008922000, NYQUSP, QUEENS COUNTY
... ETAL HOSPITAL JERZY MACURA, M.D.,          DOMINICK GADALETA, ...

29. VIGILANTE,JOSEPH v. NYCH&HC, DISPOSED ON 06/07/1995; 325D, MEDICAL MALPRACTICE, 05/11/1992, 0105011992, NYKISP, KINGS COUNTY
        NYCH&HC JERSEY MACURA, M.D. AND ROBERT ...

30. WEEKS, BRENDA v. MCMULLEN, HEATHER M.D., ACTIVE, MEDICAL MALPRACTICE, 12/31/2003, 0128232003, NYRISP, RICHMOND COUNTY
... NICASTRO, M.D. JERZY MACURA,          M.D. GUOJIE HUANG, ...

31. WRIGHT,KIM JEFFERSON v. ROSLIN,MITCHELL M.D., ACTIVE, MEDICAL MALPRACTICE, 02/13/2001, 0180882000, NYBRSP, BRONX COUNTY
... CHERNOBELSKY,M.D.,J.MACURA, M.D.,MAIMONIDES          HOSPITAL, ...

LAW OFFICES

# KAMENSKY RUBINSTEIN HOCHMAN & DELOTT, LLP

AN LLP INCLUDING PROFESSIONAL CORPORATIONS

SUITE 200

7250 NORTH CICERO AVENUE

LINCOLNWOOD, ILLINOIS 60712-1693

(847) 982-1776

FACSIMILE: (847) 982-1676
WWW.KR-LAW.COM

MILES J. ZAREMSKI
(847) 568-5602
E-MAIL: mzaremski@kr-law.com

SUITE 4300
30 NORTH LASALLE STREET
CHICAGO, ILLINOIS 60602
TELEPHONE (312) 368-1776
TELEPHONE (312) 807-3960

January 5, 2006

<u>VIA FACSIMILE & U.S. MAIL</u>
Ms. Ellen Waller
Administrator, Central Judicial Committee
American College of Surgeons
633 N. Saint Clair Street
Chicago, Illinois 60611-3211

Re:    Joseph Kamelgard, MD, FACS/Newman v. Staten Island Hospital

Dear Ms. Waller:

Thank you for your December 29, 2006 letter. As long as the CJC has postponed any hearing regarding Dr. Kamelgard until at least June 8, 2007, if at all, and will only be considering my December 21, 2006 letter at its February 9, 2007 meeting, I would like to have the CJC also consider two points in supplementation of that letter. Specifically, that Dr. Kamelgard 1) as of November, 2005 was quite well qualified in the practice of his profession and was in that practice, and 2) testified openly and honestly regarding the nature of his practice when he provided deposition testimony on November 16, 2005, and trial testimony on November 30, 2005.

"Active" (as in active practice), referenced in Dr. Collicott's April 5, 2006 letter, is defined nowhere in any rule, regulation, bylaw or material authored by the ACS. As a basis for our contention that Dr. Kamelgard was in active practice, I append his *curriculum vitae*, Exhibit "A". Note that as of November 30, 2005, he had full General Surgery privileges (including advanced laparoscopic techniques and Bariatric Surgery procedures) at the University Hospital and at St. Joseph's Regional Medical Center. His privileges at St. Barnabas Medical Center were limited to "open" Bariatric Surgery procedures, which is all Dr. Kamelgard ever asked for. Moreover, as of March 2, 2005, Dr. Kamelgard's application for the American Society for Bariatric Surgery Center of Excellence-Provisional Status, was approved. This designation included his clinic, Lighter for Life, P.C., St. Joseph's Regional Medical Center, and, of course, Dr. Kamelgard. Notification of this is attached, as Exhibit "B". He maintained malpractice insurance for bariatric surgery from 1998 to the present, (costing Dr. Kamelgard roughly $50,000.00 per year) and was active in maintaining his continuing medical education requirements as well as his participation in the American Society for Bariatric Surgery. In

**EXHIBIT**

**D**

KAMENSKY RUBINSTEIN
HOCHMAN & DELOTT, LLP

Ms. Ellen Waller
January 5, 2007
Page 2

addition to remaining active as the Director of the St. Joseph's Regional Medical Center's Bariatric Medical Center throughout the winter, spring and summer, 2005, Dr. Kamelgard was also designing, building and planning a new Bariatric Surgery specific office in Paramus, New Jersey, which opened on September 1, 2005. He began seeing prospective patients in September 2005. Throughout all this time, he continued to make public presentations to groups of prospective patients every other week and personally attended each of the monthly support group meetings. He continued to carry a pager and cell phone, and maintained his answering service, in order for patients to have immediate access to him for care and treatment.

Based on the above, no reasonable physician sitting on the CJC, guided by the rules of the ACS, could state Dr. Kamelgard was not in active practice, particularly when "active" is nowhere defined by the ACS.

Next, Dr. Kamelgard spoke truthfully when he testified. During his deposition on November 16, 2005, he stated that from the summer of 2000 until the summer of 2003, he performed between 200-250 surgical procedures. These were a combination of open (90%) and laparoscopic (10%) surgeries. After 2003, his role at St. Joseph's Hospital was more administrative than as a surgeon doing surgeries on a routine basis. He had to establish the program in bariatric surgery, credentials and guidelines, train the staff and the OR nurses, put protocols in place, and establish his center as one of excellence through the Surgical Review Corporation, a related entity to the American Society of Bariatric Surgery. As indicated earlier in this letter, that status was granted. As a result of all of the preceding, he only had time for a handful of surgeries. He testified truthfully to this, without being misleading, deceptive or providing false testimony in this regard. *See* pp. 57-58 of his deposition, attached as Exhibit "C". Complementing this honesty is Dr. Kamelgard's trial testimony on November 30, 2006, wherein he stated, again under oath, that he did three or four surgeries at the end of 2004. *See* p. 542 of the trial testimony, attached as Exhibit "D". Any such testimony was also consistent with ACS' "Expert Witness Affirmation" which Dr. Kamelgard executed on September 11, 2001. This was provided to plaintiff's lawyer when he engaged Dr. Kamelgard in October, 2005. A copy of this affirmation is attached as Exhibit "E".

As a result of the above, Dr. Kamelgard was "actively involved in the clinical practice", per ST-8, as rev'd 2/04, when he testified in November 2005; was familiar at the time of his testimony with the standard of care provided at the time of the occurrence at issue in the *Newman* case,[1] per ST-8; and satisfied Article VII, Sections 1(f),(i), in that his testimony regarding his practice was stated truthfully and honestly. And, as we mentioned in our December 21, 2006 letter, there cannot be a blind eye to the fact that we believe the complainant against Dr. Kamelgard is a physician named in over 30 medical malpractice lawsuits, including the *Newman* lawsuit in which Dr. Kamelgard testified.

---

[1]   See p. 134 of deposition testimony, and pp. 400-401 of trial testimony, attached as Exhibit "F". (Standards that Dr. Kamelgard trained with were the same standards that existed in April, 1997, the time of the occurrence.)

Ms. Ellen Waller
January 5, 2007
Page 3

On behalf of Dr. Kamelgard, we continue to ask that the CJC terminate any proceedings against Dr. Kamelgard when it meets on February 9, 2007. Thank you in advance for your courtesies.

Very truly yours,

KAMENSKY RUBINSTEIN
HOCHMAN & DELOTT, LLP

Miles J. Zaremski

MJZ/rdw

MJZ/rdw
Enclosures

cc:    Joseph Kamelgard, M.D., FACS (w/encs.) (via email)

W:\WP51\MILES\MJZ0460 DOC

LAW OFFICES

# KAMENSKY RUBINSTEIN HOCHMAN & DELOTT, LLP

AN LLP INCLUDING PROFESSIONAL CORPORATIONS

SUITE 200

FACSIMILE: (847) 982-1676
WWW.KR-LAW.COM

7250 NORTH CICERO AVENUE

LINCOLNWOOD, ILLINOIS 60712-1693

(847) 982-1776

SUITE 4300
30 NORTH LASALLE STREET
CHICAGO, ILLINOIS 60602
TELEPHONE (312) 368-1776
TELEPHONE (312) 807-3960

MILES J. ZAREMSKI
(847) 568-5602
E-MAIL: mzaremski@kr-law.com

January 8, 2007

VIA FACSIMILE & U.S. MAIL
Ms. Ellen Waller
Administrator, Central Judicial Committee
American College of Surgeons
633 N. Saint Clair Street
Chicago, Illinois 60611-3211

Re:    Joseph Kamelgard, MD, FACS/Newman v. Staten Island Hospital

Dear Ms. Waller:

By now, you should be in receipt of my letter of January 5, 2007. I note a couple of typographical errors, so this letter should be attached to it, as a supplement.

1.    The date of the letter should obviously be January 5, 2007, not 2006.

2.    Lest there be no confusion, the statement at the top of page 2, "He began seeing prospective patients in September, 2005", is not to be read that he was not otherwise engaged in active practice starting September, 2005, but just that he began seeing patients in his brand new private facility, commencing September, 2005. He was otherwise engaged in the active practice before September, 2005.

3.    Reference to Exhibit "E" ("Expert Witness Affirmation") as being executed on September 11, 2001 by the American Board of Surgery is incorrect. Exhibit "E" does not provide for an execution date, but the document was provided by Dr. Kamelgard to Mr. Newman's legal counsel in October, 2005, when Dr. Kamelgard was so retained.


EXHIBIT
E

KAMENSKY RUBINSTEIN
HOCHMAN & DELOTI, LLP

Ms. Ellen Waller
January 8, 2007
Page 2

Thank you.

Very truly yours,

KAMENSKY RUBINSTEIN
HOCHMAN & DELOTI, LLP

Miles J. Zaremski

MJZ/rdw

cc:    Joseph Kamelgard, MD, FACS (via email)
W:\WP51\MILES\RW1504.DOC